**SCIENCE AND RESEARCH FOUNDA-
TION, INC., a Corporation,
Plaintiff,**

**v.**

**UNITED STATES of America,
Defendant.**

**Civ. A. No. 2595.**

United States District Court
S. D. Illinois, S. D.
Jan. 25, 1960.

Robert J. Myers, Springfield, Ill., for plaintiff.

Harlington Wood, Jr., U. S. Atty., Springfield, Ill., Deane E. McCormick, Dept. of Justice, Tax Division, Washington, D. C., for defendant.

POOS, District Judge.

This is an action by plaintiff for the recovery of Internal Revenue taxes for the years 1950, 1954, 1955 and 1956 in the amount of $703.82, plus interest.

The parties have stipulated the facts.

Plaintiff was incorporated December 17, 1945, under the General Not For Profit Corporation Act of the State of Illinois, S.H.A.Ill. ch. 32, § 163a et seq. The Articles of Incorporation state that the purpose of the corporation was to procure the writing and compilation by competent persons of articles, pamphlets and books explaining and summarizing verified knowledge about the universe and its living inhabitants, and to secure publication and distribution of its literature. On March 17, 1948, the Articles were amended to authorize plaintiff taxpayer to provide funds for loans to students in secondary schools, colleges and universities, and to change the name to Science and Research Foundation, Inc.

Since the amendment taxpayer has made one student loan.

On October 13, 1952, taxpayer, in order to fulfill its primary purpose, entered into a contract with Science Research Associates, Inc., a corporation (hereinafter called Associates) organized and operated for profit and incorporated under the laws of Illinois. The latter corporation is engaged in the production, distribution and sale of educational and business publications. Under the contract, Associates agreed to print and publish a minimum of fifteen booklets in the series, to distribute these booklets through its guidance service, and to publish a minimum of five different titles during the school years, 1954–1955, 1955–1956, and 1956–1957, for taxpayer. In addition, it also agreed to assume responsibility for planning the series, determining the content of the individual booklet and their format, but was required to submit all these to the decision of plaintiff for its approval. The cost of printing, promoting and distributing the booklets was to be borne by Associates, but taxpayer was obliged to pay the salary of the series editor and the fees for consulting editor and authors' fees. Under the agreement, Associates agreed to pay taxpayer royalties on all copies of each booklet sold, after the sale of the initial 15,000 copies, of eight per cent of the net sales of the booklets sold in the United States, and four per cent of the net sales of booklets sold outside of the United States.

The above mentioned contract was modified by letter dated December 16, 1953. In this letter it was agreed, among other things, that after taxpayer had received royalties equal to its total investment in the series, Associates would discontinue the payment of royalties to plaintiff. Rather, any additional royalties accruing in favor of plaintiff would be placed in a segregated fund to be used for the publication of new booklets or for the further circulation of those already published.

The plaintiff has no proprietary, financial or other interest of any kind in Associates, and none of the officers of plaintiff have any proprietary, financial or other interest of any kind in Associates. The evidence in the record shows that the officers and directors of taxpayer corporation received no salaries. All services rendered were gratuitous. The officers went to Chicago on unrelated, paid-for business enterprises, and while there took time off to find a publisher capable of performing, both from a printing capability and a distribution experience, the function of marketing among educational institutions the booklets containing the knowledge that the founder of the corporate fund desired to be placed in educational channels.

It is apparent from the stipulation and other evidence introduced that no private profit was involved. This corporation taxpayer had no large amount of funds with which to carry out its corporate purposes. It appears from the stipulation that the total funds of the corporate taxpayer were either received from Dr. Charles Shamel, who had devoted the latter part of his life and a large part of his fortune to research in

various fields of science and education, or from his estate. The total corporate funds did not exceed $33,000. The funds that it spent with Associates, $13,825.85, were expended chiefly for the salary of the series editor, consulting editors' fees, and authors' fees. The contract with Associates provided for these payments by taxpayer. The third paragraph of the contract provides: "The publisher agrees to pay the costs of printing, promoting and distributing the booklets."

It further appears from the record that the directors and officers of taxpayer are Irving E. Pearson, who is Executive Secretary of the Illinois Education Association, Dr. Claude Vick, who is Director of Professional and Public Relations for Illinois Education Association, and James E. Hanselman, who serves as an investment counsellor to the corporate taxpayer, and who is also with the brokerage firm of H. E. Edwards & Son in Springfield, Illinois.

Dr. Shamel acquired a large estate during his lifetime. He donated a 230-acre tract of land in Charles County, Maryland, to the National Education Association, and he gave a 750-acre farm in Christian County, near Taylorville, Illinois, to Blackburn College. He created the corporate taxpayer for the purpose as disclosed by its charter, viz.:

> "Procuring the writing and compilation by competent persons of articles, pamphlets and books in clear, simple and readable style, explaining and summarizing verified knowledge, especially the latest, about the universe and its living inhabitants, including man, which has been accumulated by scientists and the publication of the same with their widest possible distribution and sale without profit, thereby assisting all, especially the young to gain a true understanding of the wonderful universe in which they live, and so help each of them to live happier, more useful lives, and also to assist in carrying on, from time to time, researches on specific scientific subjects and useful inventions."

A study of the record discloses a purpose in view of an intense desire on his part to disseminate scientific knowledge as cheaply as possible. Wide search was made to find someone having the capability to do this. The taxpayer finally found Associates and the aforementioned contract resulted. It must be kept in mind that the corporate fund was none too large to accomplish this purpose, but accomplish it the taxpayer did. Copies of the pamphlet and booklets are in evidence. It was a part of Mr. Shamel's plan that the editor and authors were to be paid. This was carried out as disclosed by the contract. The taxpayer made application for an exemption which was denied. There is no dispute that the purpose here involved was within the purview of the Congressional intention, but the dispute is rather as to the method used to accomplish the purpose.

The question under the facts is aptly stated in the brief of the government: "whether plaintiff was entitled to an exemption under Section 501(c) (3) of the Internal Revenue Code of 1954 [26 U.S.C.A. § 501(c) (3)] as a foundation organized and operated exclusively for educational purposes when its sole activities consisted of subsidizing a commercial organization engaged in the business of publishing and selling books and pamphlets for a profit."

The position of the government is clear as stated in its brief. This position is opposed in a like clear manner by the taxpayer. The pertinent provision of the statute is (I.R.C. Sec. 501(c):

> "Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual * * *."

The regulations issued under this Section emphasize the fact that an organization to fall within the provisions thereof must be both organized and operated exclusively for one or more of the speci-

fied purposes, and if an organization fails to meet either the organizational test or the operational test, it is not exempt.

These regulations make it clear that an organization will not be considered as organized or operated exclusively for one or more of the exempt purposes if more than an insubstantial part of its activities are not in furtherance of an exempt purpose. Treasury Regulations, Sections 1.501(c) (3)–1(b) (i) (iii) and 1.501(c) (3)–1(C) (1).

It must be kept in mind that the law and the regulations refer to the taxpayer itself. The law and the regulations do not refer to a disassociated corporation who might, for instance, print the advertising for a community chest or the literature explaining the same. These things must be paid for, and the statute does not prohibit or forbid such activities. The evidence in this record shows that taxpayer is not a subterfuge to subsidize Associates. There is no connection whatsoever between taxpayer and Associates. The statute says " * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual * * * ." I.R.C. Sec. 501(c). These words clearly and without question refer to the corporation contemplated in the first sentence of the statute. They do not refer to a corporation that might be employed to print the pamphlets, booklets and literature and to market the same, even though a profit might be involved to Associates. (Any profit made by Associates, a profit corporation, is subject to the "Income Tax Act".) It is not possible to read such into the intention of Congress in passing Sec. 501. If such were the law, it would not be possible to have an exempt organization under the law. Certainly such was not the intention of Congress, and it is equally clear from the record in this case that no profit accrued to taxpayer, or to any private shareholder or individual connected with taxpayer. In fact, you find in this record only people who were devoted to carrying out the purpose of the corporate creation of dissemination of knowledge.

It cannot be said, in the light of this record, that taxpayer's activities are largely animated for a commercial purpose, or that the contract herein was for a supposed commercial objective, and the further fact is that taxpayer had no great financial gain. Rather the fact is that soon the expense of dissemination of knowledge, as contemplated by the charter, will be so great that the funds of taxpayer will be exhausted. The record further shows that in order to keep out profit motives, the royalty feature of the original contract was amended to set aside any royalty received in a segregated fund to be used for the publication of new booklets, or for further circulation of those previously published; or in the event that all publication is discontinued and the contract annulled, should any royalty remain, it was agreed that any balance remaining shall be paid to an educational or scientific organization to be selected by taxpayer. The contract in question was not such as deprived the taxpayer of the right to have an exemption, and the Treasury erred in denying the exemption.

The facts in this case come clearly within the defined purpose of Section 501 as construed and interpreted by the Supreme Court in Trinidad v. Sagrada Orden, 263 U.S. 578, 44 S.Ct. 204, 205, 68 L.Ed. 458, wherein the Court said:

"The defendant concedes that the plaintiff is organized and operated for religious, charitable and educational purposes and that no part of its net income inures to the benefit of any stockholder or individual, but contends that it is not 'operated exclusively' for these purposes, and therefore is not within the exception in the taxing act. Stated in another way, the contention is that the plaintiff is operated also for business and commercial purposes in that it uses its property to produce income, and trades in wine, chocolate and other articles. In effect, the contention puts aside as immaterial the fact that the income from the

properties is devoted exclusively to religious, charitable and educational purposes, and also the fact that the limited trading, if it can be called such, is purely incidental to the pursuit of those purposes, and is in no sense a distinct or external venture.

"Whether the contention is well taken turns primarily on the meaning of the excepting clause, before quoted from the taxing act. Two matters apparent on the face of the clause go far towards settling its meaning. First, it recognizes that a corporation may be organized and operated exclusively for religious, charitable, scientific or educational purposes, and yet have a net income. Next, it says nothing about the source of the income, but makes the destination the ultimate test of exemption.

"Evidently the exemption is made in recognition of the benefit which the public derives from corporate activities of the class named, and is intended to aid them when not conducted for private gain. Such activities cannot be carried on without money; and it is common knowledge that they are largely carried on with income received from properties dedicated to their pursuit. This is particularly true of many charitable, scientific and educational corporations and is measurably true of some religious corporations. Making such properties productive to the end that the income may be thus used does not alter or enlarge the purposes for which the corporation is created and conducted. This is recognized in Northwestern University v. People of State of Illinois, 99 U.S. 309, 324 (25 L.Ed. 387) where this court said: 'The purpose of a college or university is to give youth an education. The money which comes from the sale or rent of land dedicated to that object aids this purpose. Land so held and leased is held for school purposes, in the fullest and clearest sense.' To the

same effect is Methodist Episcopal Church South v. Hinton, 92 Tenn. 188, 200, 21 S.W. 321, [19 L.R.A. 289]. And in our opinion the excepting clause, taken according to its letter and spirit, proceeds on this view of the subject.

"The plaintiff, being a corporation sole, has no stockholders. It is the legal representative of an ancient religious order the members of which have, among other vows, that of poverty. According to the Philippine law under which it is created, all of its properties are held for religious, charitable and educational purposes; and according to the facts stipulated it devotes and applies to those purposes all of the income—rents, dividends and interest—from such properties. In using the properties to produce the income, it therefore is adhering to and advancing those purposes, and not stepping aside from them or engaging in a business pursuit."

The tax herein levied is not a tax against the contract in question, but is a tax against the corporate income which the corporation uses to disseminate the knowledge that its charter provides for. No part or portion of either principal or income is for private gain to the corporation, or any member, stockholder or individual thereof. The fact that it became necessary with its limited amount of resources to engage the services of Associates in no wise changes its character from a scientific and educational not-for-profit corporation to one for private profit. As in the above case, the Philippine Congress recognized the right of the corporation to be created for religious, scientific and educational purposes, and so has the General Assembly of Illinois; and Congress had the same purpose in view in creating the exemption in question. The money sought to be taxed, the income of the investments of this corporation, aids the educational purpose of this corporation and it is held for educational purposes in the fullest sense under the facts in this record.

The fact that the managers of this corporation made the corpus productive to the end that the income may be used for the legitimate educational purposes of the corporation in no wise "alters or enlarges" the purposes for which this corporation taxpayer was created or is conducted. The destination of the income placing the material in the hands of those seeking knowledge is the criteria that determines, not the fact that a favorable contract was made to carry out the purpose.

Under all the facts in this record I conclude that the Commissioner erred in refusing to grant the exemption and therefore the Corporation should be exempted from income taxation.

The facts as hereinabove stated and the pertinent provisions of the law and Treasury Regulations are hereby adopted as conclusions of law and fact and judgment is rendered in favor of plaintiff for $703.82 plus interest, as provided by law.