SAN FRANCISCO INFANT SCHOOL, INC., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4246–77X.     Filed March 20, 1978.

*Harold J. McElhinny*, for the petitioner.
*Kevin M. Bagley*, for the respondent.

OPINION

DAWSON, *Judge:* Respondent determined that petitioner does not qualify for exemption from Federal income tax under section 501(c)(3).[1] Petitioner challenges respondent's determination and has invoked the jurisdiction of this Court for a declaratory judgment[2] pursuant to section 7428. The issue for our decision is whether petitioner was operated exclusively for

---

[1] Unless specified otherwise, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.

[2] The prerequisites for this declaratory judgment have been satisfied: petitioner exhausted its administrative remedies, sec. 7428(b)(2); the petition was filed by the organization the qualification of which is at issue, sec. 7428(b)(1); and petitioner mailed its petition before the 91st day after respondent mailed his determination in this matter, sec. 7428(b)(3). See also Rule 210(c), Tax Court Rules of Practice and Procedure.

educational or charitable purposes within the meaning of section 501(c)(3).

This case was submitted for decision on the stipulated administrative record under motions by both parties for summary judgment under Rule 121, Tax Court Rules of Practice and Procedure.[3] The evidentiary facts and representations contained in the administrative record are assumed to be true for purposes of this proceeding. The pertinent facts are summarized below.

San Francisco Infant School, Inc. (petitioner), is a California nonprofit corporation with its principal place of business in San Francisco, Calif. Petitioner filed its application for recognition of exemption under section 501(c)(3) with the San Francisco Office of the Internal Revenue Service, Exempt Organization Branch.

Petitioner was founded by Kathleen Murray and John Curran Ladd, attorneys, who perceived a need to provide their daughter with education-oriented child care which was unavailable to them on a commercial basis or elsewhere, since they did not qualify for publicly-assisted child care or for child care provided at schools or colleges. To fulfill this need they joined with Sharon Glos, a teacher specializing in infant education, and organized petitioner as a nonprofit corporation as required for day care centers under California law. Petitioner's initial articles of incorporation stated its purpose as follows:

(1) to provide a comprehensive early childhood education program and day care service for young children and to serve as a model and agent for change in the improvement and expansion of similar services in the community.

(2) to receive contributions and to make donations to, dispense contributions through, and otherwise aid and support those organizations qualified for exemption from federal income tax under the Internal Revenue Code of 1954, as now in effect or as subsequently amended, that are organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda or otherwise attempting to influence legislation, and

---

[3]For declaratory judgments not involving revocation, submission for summary judgment on the basis of the administrative record is in accordance with Rule 217, Tax Court Rules of Practice and Procedure, which reads in part as follows: "Only with the permission of the Court, upon good cause shown, will any party be permitted to introduce before the Court any evidence other than that presented before the Internal Revenue Service and contained in the administrative record." See also *Houston Lawyer Referral Service, Inc. v. Commissioner*, 69 T.C. 570 (1978).

that do not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office;

During the process of seeking administrative determination of exempt status petitioner amended the first of these purposes to comply with respondent's interpretation of the organizational requirements for a section 501(c)(3) exemption. As amended the first purpose is:

(1) to further charitable and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code, more specifically by providing a comprehensive early childhood education program for young children, by serving as a model for the improvement and expansion of similar services in the community, and by providing such incidental day care services as are necessary in furtherance of the said early childhood education program.

To cover organizational costs John Curran Ladd loaned $1,000 without interest to petitioner with repayment contingent on the financial viability of petitioner. Petitioner's school operations were located in a ground floor rental unit in the home of John Curran Ladd and Kathleen Murray for which petitioner was charged rent at not more than a fair market rental value.

Petitioner employed Sharon Glos as the head teacher for $600 per month and another full-time teacher, Kathleen Wolf, for $500 per month. Each of these teachers had specialized in providing educational child care to infants and young children. Kathleen Wolf has a bachelor of science degree in elementary education and meets the qualification for a California Children's Center Permit. She attended workshops on infant education. Previously she had served as head infant teacher at the Child Care Center of the Hastings College of Law.

Sharon Glos attended City College of San Francisco and took courses related to early childhood development and education. She qualified for the California Children's Center Permit. She attended workshops in infant education and parent effectiveness. Her professional experience included service as the assistant director and head teacher of the Child Care Center of the Hastings Law School, and as a consultant for Phoenix House (a mental health day treatment center for adults with a drop-in infant-toddler program) of Napa State Hospital.

Petitioner set a maximum enrollment of eight students, one of which was the daughter of Kathleen Murray and John Curran Ladd, to maintain a student/teacher ratio of 4 to 1. This ratio

was considered ideal for infant care and education. Enrollment was limited to infants between the ages of 6 months and 3 years. The school was supported by a tuition charge of $225 per month for full-time students. Part-time students were accepted on a temporary basis for those openings not filled by full-time students.

Petitioner's method and philosophy of infant education were described in its statement of educational policy as follows:

### CURRICULUM

The San Francisco Infant School has a developmentally-oriented program which focuses on the various developmental areas to enhance each child's growth and learning.

A. INFANT PROGRAM:

For children between the ages of six months and eighteen months, the programming consists of the following areas of emphasis, with examples of specific teaching techniques.

1) *Language Development:* A child learns to talk by hearing others talk to and around him/her. The teachers like to talk to the babies and to encourage them to talk themselves. *Examples:* A teacher [talks] to a baby, enunciating carefully, e.g., "Here is a ball, Anne," and the child repeats, or attempts to repeat, the words. Or, a child and teacher sit in front of a low mirror touching parts of faces and naming them.

2) *Sensory/Cognitive Development:* A baby's understanding of the world comes through the senses. A child learns by examining objects (toys) through touch, sound, sight and taste. As the baby explores different colors, shapes, textures, movements and sounds he learns not only the relationship between the parts of objects, but also how to learn more about the world. To promote this development, the School has acquired, and will continue to acquire, interesting objects to stimulate the interest and curiosity of each child. *Example:* A child lying on and playing with a "feely quilt"—a quilt made of many different types of fabric to allow the baby to explore the variety of textures.

3) *Gross Motor Development:* Most infants start out crawling and need a safe and baby-designed space in which to move about freely and exercise their muscles. *Examples:* The School provides three large, sunny, baby-safe rooms where the children can crawl and explore as much as they choose. Playpens are not used. A low railing along one of the walls helps children pull and support themselves when they leave the crawling stage and start walking.

4) *Fine Motor Development:* Children need opportunities to develop visual skills and hand-eye coordination. *Example:* The teacher shows an object to a child and moves it so that the child's eyes and head turn to follow the object. Hand-eye coordination is enhanced by such tasks as feeding self first with fingers, and later with a spoon and drinking from a cup. Even our youngest baby (6 months) likes to hold a spoon and tries to feed herself.

5) *Individual Self-Awareness:* It is important that each infant be respected as an independent and unique human being. A sense of self-identification is

encouraged at the School by frequent verbalization of the child's name, teaching the child parts of the body, and by respecting each child's feelings. *Example:* We talk to the children about their fears, such as, "Your Mommy and Daddy are going to work now. That is hard for you but you will see them again soon. I will be here for you until they come back." Small children may not always understand each word, but the meaning that it is OK for them to feel sad, and that the teacher will be there to care for them, is a first lesson of trust.

6) *Social Development:* A unique and important aspect of the San Francisco Infant School program is the infants' ability and interest in relating to other infants and adults at the School. Today's child often comes from a single-child home. The School offers these children an opportunity for play and social interaction which otherwise might be missing from their lives. *Examples:* The infants, as early as six months, recognize other babies, enjoy watching them, and are motivated to try out new skills, such as crawling and sitting up.

B. TODDLER PROGRAM:

As the children grow older and develop skills, different ways of learning are needed. Thus, for toddlers, 18 months to 3 years, the program will include the following:

1) *Language Development:* Children learn to express thoughts and concepts through language. The teachers help children to learn new words through exercises and songs. *Examples:* Colors are taught to children by examining various objects in the room and inquiring as to color with praise for the correct choices. Numbers are taught through songs, counting toes, people or things in the room.

2) *Cognitive Development:* Toddlers are ready to begin learning "thinking" concepts such as one-many, big-little, etc. *Example:* The teachers will let the child choose how many crackers she wants for snack and point out such things as big trees, little plants, or a big dog with little puppies.

3) *Gross Motor Development:* Children need outdoor play area and climbing opportunities to develop healthy bodies. *Examples:* A climbing structure geared to the skills of the toddlers will enable the children to exercise and learn to take risks appropriate for their individual developmental stage. Running, throwing balls, jumping and dance also offer opportunities for large muscle development.

4) *Fine Motor Development:* Toddlers continue the development of hand-eye coordination and the development of finger dexterity. *Example:* The children engage in activities such as playing with blocks, stringing beads, making collages and other creative play. The School's toys are carefully chosen to provide children each of these play activities.

5) *Individual Self-Awareness:* Toddlers are very interested in taking care of themselves as self awareness increases with age. *Example:* We encourage the development of self awareness by allowing children to help themselves while dressing, feeding and playing. Each child also has his/her own bed, and a special place to put toys and coats. We hang art work on the wall for display. Each child's birthday is celebrated at the School. All of these activities are designed to give each child a feeling of his or her own place at the School and to develop self esteem and pride in his or her work.

6) *Social Development:* Toddlers enjoy doing things with other children and

with adults. In order to facilitate these relationships, the children need to learn to respect the needs of others. *Example:* When one child wants a toy that another child has, we teach him or her to express feelings through words instead of by hitting and grabbing. Patient repetition of the basic rules of social interaction permits group play at a very early age.

In response to respondent's initial denial of exempt status as an educational organization on the ground that its services were primarily custodial, petitioner appealed the decision administratively and added to the record numerous scholarly papers outlining the importance of educational experiences for infants. In addition petitioner submitted the affidavits of Dr. Thomas Forrest (a pediatric neurologist), Dr. Ann Lodge (a clinical developmental psychologist with specialization in infant assessment and educational planning), and Gertrude Rosen (a college faculty member teaching child development, early childhood curriculum, and interaction with children) each of whom personally observed and evaluated petitioner's educational program. The views of Dr. Lodge are representative. An excerpt from her affidavit is as follows:

It is my professional opinion that the period between six months and three years is a period of critical human development during which time the infant is highly susceptible to the quality of the educational environment and the interaction with care-giving individuals. This opinion is generally shared by experts in the field of early childhood development and infant education and is based on many empirical and theoretical studies particularly those of Piaget, Pikler, Lally, Korner, Hunt, Barnard, Gordon, Brazelton, Bayley, et al.

I have reviewed the Statement of Educational Policy of San Francisco Infant School, and the resumes of its teachers. I have also visited the School and inspected its facilities, equipment and supplies. In my professional opinion, the School's staffing, facility, equipment and program are educational in nature in that all of these factors significantly further the development of the physical, social and cognitive capabilities of the infants enrolled. The School meets the essential requirements for an infant developmental program rather than being primarily custodial in nature. I am particularly impressed with the attractiveness of the environmental surroundings, suitability of educational materials and sensitivity of staff to individual developmental needs of infants in the program. The School appears to me to be an excellent example of an education-oriented developmental infant program.

Sections 501(a) and 501(c)(3) provide[4] an exemption from

---

[4]SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

Federal income tax for an organization devoted to education if three prerequisites are satisfied: (1) The organization must be organized and operated exclusively for education alone or in conjunction with other exempt purposes; (2) no part of its net earnings may inure to the benefit of any private shareholder or individual; and (3) it must not devote a substantial part of its activities to political or lobbying activity.

The first of these prerequisites is broken into two subtests in the regulations: the organizational test and the operational test, both of which must be satisfied. Sec. 1.501(c)(3)–1(a), Income Tax Regs. Since respondent concedes that petitioner met all other requirements for exemption, the sole issue here is whether petitioner passed the operational test, which provides in part that:

An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose. [Sec. 1.501(c)(3)–1(c)(1), Income Tax Regs.]

Petitioner asserts that it qualified for exemption under the operational test as an educational organization.[5]

---

*     *     *     *     *     *     *

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

*     *     *     *     *     *     *

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

[5]In the alternative petitioner sought qualification for exemption as a charitable organization. Respondent denied qualification as a charitable organization on the grounds that petitioner was self-supporting and charged parents uniform tuition without regard to financial ability. Petitioner attacks this denial by arguing that petitioner's basis for seeking qualification as a charitable organization was not that it provided care to indigent children. Instead petitioner argues that it qualified as a charitable organization since it provided educational services to children and served as a model for the application of educational programs to young children.

Providing educational services is within the scope of the term charitable and to that extent there is overlap between the terms educational and charitable which appear in sec. 501(c)(3). This is evidenced in the definition of charitable in the regulations:

"The term 'charitable' is used in section 501(c)(3) in its generally accepted legal sense and is, therefore, not to be construed as limited by the separate enumeration in section 501(c)(3) of other tax-exempt purposes which may fall within the broad outlines of 'charity' as developed by judicial

Respondent determined that petitioner failed to qualify as an educational organization since, although it has educational aspects, the care provided was primarily custodial in nature. The burden of proof is on petitioner to overcome the grounds set forth in respondent's notice of determination. Rule 217(c)(2)(i), Tax Court Rules of Practice and Procedure. Petitioner has met this burden.

To qualify for exemption as an organization described in section 501(c)(3) petitioner must be operated exclusively for educational purposes. "This plainly means that the presence of a single noneducational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes." *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945). We reject respondent's contention that the provision of custodial day care was a substantial noneducational purpose of petitioner. Rather, the custodial care was a necessary concomitant of the education. Without its custodial services, education could not have been furnished to its students.

The record establishes that purely custodial care was available elsewhere. Petitioner's avowed purpose in organization and operation was to provide an educational experience unavailable elsewhere to many children between the ages of 6 months and 3 years. In performing this service petitioner adopted a curriculum, methods, and surroundings designed to best achieve its educational purpose. The high quality of educational care achieved by petitioner has been attested to by several experts. Petitioner has become a model infant school.

---

decisions. Such term includes: Relief of the poor and distressed or of the underprivileged; advancement of religion; advancement of education or science; erection or maintenance of public buildings, monuments, or works; lessening of the burdens of Government; and promotion of social welfare by organizations designed to accomplish any of the above purposes, or (i) to lessen neighborhood tensions; (ii) to eliminate prejudice and discrimination; (iii) to defend human and civil rights secured by law; or (iv) to combat community deterioration and juvenile delinquency. * * * [Sec. 1.501(c)(3)–1(d)(2), Income Tax Regs.]"

If we find that in operation petitioner was primarily custodial with only incidental educational functions, this finding should also control the issue of qualification as a charitable organization, since here the sole basis for charitable exemption is service to education. Under these circumstances we do not believe a lesser or different standard should be applied for a charitable exemption than for an educational exemption. Thus any qualification as a charitable organization must be based on petitioner's qualification as an educational organization. Consequently, our resolution of the instant case depends solely on whether petitioner met the requirements for exemption under sec. 501(a) as an educational organization described in sec. 501(c)(3).

Petitioner's operations are consistent with the definition of "educational" in the regulations:

The term "educational", as used in section 501(c)(3), relates to—

(a) The instruction or training of the individual for the purpose of improving or developing his capabilities * * * [Sec. 1.501(c)(3)–1(d)(3)(i), Income Tax Regs.]

As its curriculum outlined above demonstrates, all of petitioner's activities are designed "to enhance each child's growth and learning." Moreover, to implement this "regularly scheduled curriculum" petitioner has "a regular faculty, and a regularly enrolled body of students in attendance at a place where the educational activities are regularly carried on." See sec. 1.501(c)(3)–1(d)(3)(ii), example (1), Income Tax Regs.

This is unlike the situation in *Better Business Bureau v. Commissioner, supra,* in which the organization had commercial purposes distinctly apart from its educational functions. Petitioner had no commercial purpose whatsoever; its sole function was to provide educational care to infants. The custodial aspects of this case were an integral and inseparable part of that education. Indeed, the custodial services were performed in a manner calculated to complement petitioner's educational purpose.

Although past cases and rulings granting exemption as an educational organization generally involve older students, we see no reason why the tender age of petitioner's students should preclude qualification. The record amply demonstrates both the importance of education for infants and petitioner's efforts to optimize the educational experience for them. The young age of petitioner's students may require more custodial care than that which most schools provide, but, as petitioner points out, custodial services of varying degree are provided by schools at all levels of education. Respondent has consistently viewed such custodial services as advancing educational purposes. See, e.g., Rev. Rul. 76–336, 1976–2 C.B. 143 (providing housing not otherwise available to college students); Rev. Rul. 67–291, 1967–2 C.B. 184 (providing a training table for coaches and members of a university's athletic teams); Rev. Rul. 67–217, 1967–2 C.B. 181 (providing food and housing for the students and faculty of a university). Moreover, in light of petitioner's efforts to make the custodial services themselves educational we are satisfied that

petitioner's major purpose was educational. Providing custodial services was incidental to its educational purpose.

This is not to say that the custodial services provided by petitioner were not substantial. Obviously they were. This may not be equated, however, with being a substantial purpose of petitioner. Rather, providing substantial custodial care was merely a vehicle for or incidental to achieving petitioner's only substantial purpose, education of the children, and is not ground for disqualification from exemption. The operational test requires that petitioner engage primarily in activities which accomplish its exempt purposes. Sec. 1.501(c)(3)–1(c)(1), Income Tax Regs. In our opinion the child care provided by petitioner was educational and in furtherance of its exempt educational purpose.

Accordingly, since petitioner had no substantial purpose which was not educational, we hold that petitioner qualified for exemption from taxation pursuant to section 501(a) as an organization described in section 501(c)(3).

*An appropriate decision will be entered.*