EST OF HAWAII, A HAWAIIAN CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9866–77X.    Filed March 28, 1979.

---

[7]Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended.

*Harry Margolis* and *Hideki Nakamura,* for the petitioner.
*Bernard B. Kornmehl,* for the respondent.

OPINION

TANNENWALD, *Judge:* Respondent determined that petitioner is not entitled to exemption from Federal income tax as an organization described in section 501(c)(3).[1] Petitioner challenges respondent's determination and has invoked the jurisdiction of this Court for a declaratory judgment pursuant to section 7428.[2] The issue is whether petitioner is operated exclusively for one or more exempt purposes within the meaning of section 501(c)(3). This case is before us on petitioner's and respondent's motions for summary judgment pursuant to Rule 121, Tax Court Rules of Practice and Procedure.

Petitioner, est OF HAWAII, formerly Presentation of Hawaii, Inc., is a corporation which was organized as a nonprofit corporation under Hawaii Revised Statutes, section 416–20, and has its principal place of business in Honolulu, Hawaii. On May 31, 1974, petitioner filed its Application for Recognition of Exemption under section 501(c)(3) (Form 1023) with the District Director of Internal Revenue, Honolulu, Hawaii. On January 27, 1976, respondent issued a final adverse determination to petitioner denying it exempt status under section 501(c)(3) and reissued said determination on June 27, 1977, to permit petitioner to petition this Court under section 7428.[3]

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[2] The statutory prerequisites for this declaratory judgment have been satisfied: petitioner exhausted its administrative remedies, sec. 7428(b)(2); the petition was filed by the organization the qualification of which is at issue, sec. 7428(b)(1); petitioner mailed its petition before the 91st day after respondent mailed his determination in this matter, sec. 7428(b)(3). See also Rule 210(c), Tax Court Rules of Practice and Procedure.

[3] Sec. 7428, which was added by the Tax Reform Act of 1976, Pub. L. 94–455, sec. 1306, was effective on Apr. 5, 1977, with respect to determinations made after Jan. 1, 1976. Since sec. 7428(b)(3) requires that a petition be filed by the 91st day after respondent's mailing of his determination, it was necessary for respondent to reissue his adverse determination. The June 27, 1977, determination was issued in response to a letter from petitioner's counsel, dated May 13, 1977, which so far as material to this proceeding merely stated: "This letter is intended to be an express request on their [petitioner's]

"Est" stands for "Erhard Seminars Training" and encompasses the general theory, the body of knowledge, and the method and techniques which are used in "est" programs and were developed by Werner Erhard. He studied and incorporated aspects of various growth and self-realization disciplines, including Zen, Gestalt therapy, yoga, various psychologies, the martial arts, general semantics, transactional analysis, body movement, self-image psychology, behavior modification, public speaking, sensitivity training and encounter, as well as religious philosophies.

The "est" programs deal with the areas of intrapersonal awareness and communication. The standard "est" training is a 52-hour session held on 2 consecutive weekends with groups of 200 to 250 people. According to petitioner's literature, it "is designed to transform one's level of consciousness and one's ability to experience, resulting in an expanded awareness and the unblocking of one's natural abilities." These sessions are conducted by persons who are called "trainers." Graduates of the standard training participate in regular activities called "seminars." "Est" also presents public lectures given by Werner Erhard and others active in this field. Erhard himself speaks to about 10,000 people per month throughout the United States. He conducts trainings, seminars, and lectures for members of various groups including the medical profession, psychologists, lawyers, minority groups, business and professional organizations, law enforcement agencies, educators, and college and public school students.

As of April 1974, "est" was training more than 800 people per month in San Francisco, Los Angeles, Honolulu, Aspen, and New York City. Between October 1971 and April 1974, "est" trained over 18,000 people. It is rapidly growing throughout the United States and in other parts of the world.

In 1973, a professional advisory board was established which has representatives from medicine, psychiatry, psychology, the legal profession, and the academic and educational communities.

Activities related to "est" are conducted by several corporations, including petitioner. On August 9, 1973, three for-profit corporations, Erhard Seminars Training (EST, Inc.), Presenta-

behalf that you reissue your adverse determination letter of January 27, 1976." That letter was written after respondent had, by letter dated May 4, 1977, invited petitioner to request a reissuance.

ciones Musicales, S.A. (PMSA), and EST International (International), entered into an agreement entitled "STANDARD EST ROYALTY AGREEMENT" (royalty agreement) with the sole objective of establishing a system for the presentation of "est" to the public through the organization of tax-exempt corporations covering different geographical areas throughout the United States.[4]

EST, Inc., is a for-profit California corporation which acquired on December 4, 1971, all rights in the United States to the body of knowledge developed by Werner Erhard.[5] On August 9, 1973, it relinquished such rights in the State of Hawaii to PMSA. The royalty agreement provides for EST, Inc., to withdraw from conducting "est" functions in the United States and to concentrate on developing new processes, methods, procedures, publications, and related matters, and on training individuals to present "est" to the public. The royalty agreement further provides for EST, Inc., to supply trainers, materials, and management services to the local tax-exempt corporations and to assume responsibility for the quality of the operations of such organizations. All trainers are employed by EST, Inc., and are required to agree that they will not become involved in any activity resembling "est" in any geographic area where a local corporation is conducting "est" programs for a period of 2 years after the trainer leaves EST, Inc.

PMSA is a Panamanian corporation which engages in the ownership and promotion of literary, artistic, and educational publications, patents and licenses, and the promotion of individuals involved in literary, artistic, and educational activities. It does business throughout the world, except the United States. It owns and controls all rights outside the United States and also in Hawaii (having had such latter rights reliquished to it by EST, Inc.) to the body of knowledge, publications, processes, methods, procedures, etc., developed by Werner Erhard and to all new material that is developed therefrom (generally referred to as "est").[6] PMSA licensed all of its rights to International.

---

[4]For convenience, such corporations are referred to herein as tax-exempt organizations, although tax-exempt status has not been established.

[5]The record does not show from whom such rights were acquired. Nor does it reveal precisely what constitutes such body of knowledge or the legal technicalities of ownership. For our purposes, we accept the statement as true. See Rule 217(b), Tax Court Rules of Practice and Procedure.

[6]We infer from the record that EST, Inc., retains all such rights in the United States except those which have been relinquished to PMSA, i.e., rights in Hawaii.

International is a corporation chartered in Tortola, British Virgin Islands, to engage in the development, promotion, sale, and licensing of industrial equipment, machinery, processes, and material, and of artistic and educational equipment, products and materials, television and motion pictures, records, cassettes, publications, and literary works. The royalty agreement provides for it to license its rights to the body of knowledge developed by Werner Erhard to tax-exempt organizations established in all the States under essentially identical terms and conditions. Such agreements will normally be renewed annually and renewal depends, in part, on whether the licensee uses its excess funds in the public interest in a manner consistent with the research and educational objectives of "est."

Under the system established by the royalty agreement, tax-exempt organizations make payments only to International.[7] EST, Inc., is fully compensated by PMSA and PMSA is fully compensated by International for all services and obligations undertaken pursuant to the royalty agreement. The parties to the royalty agreement contemplate maximum reinvestment of the proceeds at every level of operation to expand the size and quality of "est" programs.

Pursuant to the royalty agreement, a tax-exempt organization licensed by International is authorized to use the abbreviation "EST" for all reasonable purposes consistent with the public presentation of "est." New materials may be copyrighted in the name of the tax-exempt corporation, but copyrights must be assigned without consideration to PMSA or International if the license is terminated. Each tax-exempt organization is required to agree not to become involved in any activity resembling "est" in a geographical location where a tax-exempt organization licensed to present "est" programs is functioning for 2 years after the termination of its licensing agreement.

Petitioner was incorporated by "est" graduates as the first step in the implementation of the royalty agreement. Their objective is to develop and expand the principles and concepts of "est." They intend to provide "est" training and seminars, to develop, promote, and sell "est" publications, engage in "est"

---

[7]Notwithstanding this provision in the royalty agreement, a licensing agreement between petitioner and International provides that petitioner will reimburse EST, Inc., for certain expenses. See par. 11 of licensing agreement, p. 1073 *infra*.

educational work, provide "est" lectures, and generally engage in related educational efforts in the State of Hawaii.

Membership in petitioner is limited to graduates of the training designated "Erhard Seminars Training." In order to retain membership status, an individual must vote in the election of the directors of the corporation at least once in the first 3 years and once in every successive group of three elections. To be eligible for election to the board of directors, an individual must be a resident of Hawaii and a graduate of "Erhard Seminars Training." Directors and officers receive no compensation for their services.

On August 15, 1973, petitioner entered into an agreement with International entitled "EST Licensing Agreement" (licensing agreement) which incorporated the royalty agreement. The licensing agreement provided, in pertinent part, as follows:

International represents and warrants:

1. It is the licensee of the owner of all of the rights to that body of knowledge developed by Werner Erhard, referred to herein as EST. Its rights extend to all new EST material that may develop from training courses and seminars everywhere or as may be developed by Werner Erhard and Erhard Seminars Training.

2. It is legally in a position to license the rights to the EST material to [petitioner] for up to ten years after August 9, 1973.

3. It has acquired the rights to the services of EST trainers for the State of Hawaii for a period of ten years from and after August 9, 1973. It can and will supply to [petitioner] the services of such EST trainers under this agreement.

\* \* \* \* \* \* \*

In consideration of the premises, it is hereby agreed:

\* \* \* \* \* \* \*

2. This Agreement shall license [petitioner], as set forth below, for the period August 15, 1973, to December 31, 1974, inclusive. The license shall continue on an annual basis without the necessity for renewal until August 8, 1983. Either party hereto may give the other ninety (90) days' written notice that the license granted herein and this Agreement are to come to an end. \* \* \*

3. [Petitioner] shall have a non-exclusive license to use all EST materials under the direction of an EST trainer in the State of Hawaii during the period for which this agreement is effective. International shall not make the EST materials available to any other person or entity for the State of Hawaii without giving [petitioner] 30 days' prior written notice.

4. This license shall entitle [petitioner] to conduct EST trainings, seminars and lectures and generally to promote EST concepts in accordance with EST principles.

5. [Petitioner] has scheduled and will conduct no less than six trainings in the period commencing August 15, 1973, and ending August 14, 1974. [Petition-

er] shall charge not less than Two Hundred Dollars ($200.00) as tuition for any EST training.

6. One half of all of the gross proceeds of any EST event or activity other than regular monthly seminar series conducted by [petitioner] from and after August 15, 1973, shall be paid by [petitioner] to International as the sole consideration for this licensing agreement.

7. [Petitioner] shall conduct regular EST seminars. The number shall be consistent with the number of EST trainings and the number of EST graduates. Charges for seminars shall lie in the sole discretion of [petitioner] and all fees or charges recovered shall be the property of [petitioner]. [Petitioner] shall sponsor and host special events and special appearances of Werner Erhard and other EST trainers and speakers, with prior notice and prior discussion. The proceeds of said events, where there is a donation requested, shall be at the discretion of The Foundation,[8] for the benefit of The Foundation.

8. International will supply to [petitioner] EST trainers in sufficient numbers to carry out all EST trainings scheduled by [petitioner]. * * *

9. The parties expected the initial management problems that have arisen with the creation of a new tax-exempt, non-profit corporation of the character of [petitioner]. [EST, Inc.] has supplied a trainer acceptable to [petitioner] who has assumed and still carries out management responsibilities. It is intended that the trainer will be the executive secretary for [petitioner] and act as overall administrator of the day-by-day activities of [petitioner]. International will supply management services through [EST, Inc.] for a period not to exceed twenty four months from August 15, 1973, * * * . The resident trainer will establish procedures and conduct operations in a fashion designed to make [petitioner] a smooth, efficient organization without undue burden to the Board of Directors, subject always to the approval of the Board of Directors * * * All expenses related to said management, with the exception of trainer's salary, shall be the responsibility of [petitioner]. This shall include, but is not limited to, air travel for all personnel, telephone, meals, lodging, all printed and promotional material, supplies and salaries of all personnel other than said trainer. * * *

10. The expenses of operating [petitioner's] office, carrying on the EST activities of [petitioner], including local expenses of trainer, and any additional expenses that EST, Inc., may incur as a result of services supplied or because of the presence of EST, Inc., personnel in Hawaii, and all other related matters, are the sole responsibility of [petitioner]. International will be responsible for the salaries of the trainers it is required to and has supplied to [petitioner].

11. EST, Inc., is committed to supplying [petitioner] management and training of the highest calibre. EST, Inc., will therefore necessarily incur additional expenses in management communications in carrying out broad [petitioner] responsibilities. [Petitioner] intends to and will promptly reimburse EST, Inc., for such expenses as they arise.

12. If [petitioner] is denied tax-exempt status, either by the United States of America or the State of Hawaii, International may cancel this Agreement

---

[8]The Foundation for the Realization of Man is being established under California law by seminar graduates as a tax-exempt, nonprofit, educational, scientific, and religious corporation for the purpose of promoting research in all of the areas of human activity, of which "est" is a small part.

on thirty (30) days' written notice. The same shall be true if [petitioner] at any time loses its tax-exempt status. It being understood that the liability of the parties hereto shall then be limited to an accounting settling the accounts between the parties as of the date of this termination.

13. [Petitioner] has entered into a separate settlement accounting agreement with Erhard Seminars Training, a copy of which is attached to this Agreement and incorporated herein by this reference as fully set forth.[9]

\*     \*     \*     \*     \*     \*     \*

14. [Petitioner] is to currently pay to International 50% of the gross receipts collected by [petitioner] for EST training courses. Such payments shall be made within 48 hours of the completion of the training by wire to Barclays Bank on Tortola to the account of International until further notice.

Petitioner expects to derive all its assets from student fees, lecture admissions, and occasional donations. Petitioner does not intend to utilize fund-raising programs. The tuition for the standard training course is $200. Seminars are generally given in a series on related topics at a charge of $2.50 per seminar. The admission fee for lectures will generally range from $3 to $7.50 depending primarily on the eminence of the lecturer. Educational materials are supplied to the students free or at cost. Petitioner expects to lease most of the necessary equipment and will own only some office equipment and educational and promotional materials. Any excess funds are to be used for educational or scientific research. Petitioner's charter of incorporation provides that, upon the dissolution or winding up of petitioner, its remaining assets shall be distributed to the University of Hawaii to be used exclusively for research in the areas of psychology or medicine related to the understanding of human consciousness so long as the University of Hawaii is a tax-exempt organization within the meaning of section 501(c)(3). If the University of Hawaii does not so qualify, then petitioner's remaining assets shall be distributed to the University of the California located at Berkeley, Calif., for the same purposes and upon the same conditions. If the University of California does not so qualify, then said distribution shall be made to the State of Hawaii to be used exclusively for one or more public purposes.

On August 15, 1973, EST, Inc., ceased doing business in the State of Hawaii and petitioner began doing business there. However, EST, Inc., collected money due petitioner and paid ex-

---

[9]Despite the present tense wording of this paragraph, the settlement agreement, a copy of which is stated to be attached, bears the date of Jan. 3, 1974—4½ months after the date of the licensing agreement.

penses of petitioner until March 1974. Accounts were settled between the two entities. See par. 13 of the licensing agreement and n. 9 *supra.*

From August 13, 1973, through August 31, 1975, petitioner paid royalties totaling $481,277 and was billed for overhead expenses totaling $152,299.[10] During the same period, 89,461 persons became "est" graduates by taking the standard training presented by petitioner.

Petitioner's receipts and expenditures for the period August 15, 1973, through April 30, 1974, were as follows:

| | | |
|---|---:|---:|
| Receipts from lectures, seminars, and trainings | | $265,209.55 |
| Less related expenses: | | |
| Royalties for franchise | $120,791.47 | |
| Hall and equipment rental | 41,196.98 | |
| Air travel | 11,995.26 | |
| Printing | 6,376.93 | |
| Telephone | 5,671.45 | |
| Meals and lodging | 5,453.22 | |
| Postage | 3,417.51 | |
| Material and supplies | 1,444.94 | |
| Land travel | 34.33 | 196,382.09 |
| | | 68,827.46 |
| | | |
| Less general expenditures: | | |
| Contributions, gifts, grants | 60.00 | |
| Salaries and wages | 15,563.14 | |
| Interest | 22.68 | |
| Rent | 4,416.38 | |
| Depreciation and depletion | 88.68 | |
| Travel and transportation | 9,792.44 | |
| Telephone and wire | 7,829.99 | |
| Professional services | 5,805.00 | |
| Stationery and supplies | 5,120.73 | |
| Printing | 3,642.66 | |
| Staff allowances and benefits | 3,037.12 | |
| Postage | 2,124.78 | |
| Payroll taxes | 1,377.42 | |
| Entertainment and gifts | 1,129.74 | |
| Board of directors meetings | 1,086.13 | |

[10] It is unclear what these expenses entail or pursuant to what agreement such payments were made. They may be payments to EST, Inc., pursuant to par. 11 of the licensing agreement. See n. 7 *supra.*

| | | |
|---|---|---|
| Contract services | 445.00 | |
| Insurance | 279.00 | |
| Repairs and maintenance | 223.71 | |
| Membership meetings | 175.00 | |
| Janitorial supplies | 150.04 | |
| Licenses | 3.75 | 62,373.39 |
| Net receipts | | 6,454.07 |

Petitioner's balance sheet for the period ending April 30, 1974, is as follows:

Assets
| | |
|---|---|
| Cash | $65,390.79 |
| Accounts receivable | 3,925.97 |
| Depreciable and depletable assets | 1,640.33 |
| Total assets | 70,957.09 |

Liabilities
| | |
|---|---|
| Accounts payable | 13,713.02 |
| Advance enrollment fees | 50,790.00 |
| Total liabilities | 64,503.02 |
| Net worth | 6,454.07 |
| Total liabilities and net worth[1] | 70,957.07 |

[1] Stipulated total. Correct total would be $70,957.09.

The initial question for decision is whether either party's motion for summary judgment should be granted. Petitioner has attached affidavits to its motion for summary judgment. Respondent contends that we should disregard these affidavits because Rule 121(d), Tax Court Rules of Practice and Procedure, requires that supporting affidavits set forth facts which would be admissible in evidence, the facts contained in the affidavits are not admissible because our Rule 217(a) provides that a party in an action for declaratory judgment will be permitted to supplement the administrative record, only with permission of the Court upon good cause shown, and petitioner has not shown good cause. We agree with respondent's interpretation of our Rules. Indeed, to decide otherwise would allow circumvention of Rule 217(a), Tax Court Rules of Practice and Procedure, as interpreted by *Houston Lawyer Referral Serv. v. Commissioner*, 69 T.C. 570 (1978).

We also agree with respondent that petitioner has not shown good cause to supplement the record. The affidavits attempt to clarify the grounds on which the tax exemption was denied, to describe the character of the royalty payments provided for in the licensing agreement and the fair market value of the services received by petitioner in exchange for such royalty payments, and to explain accounting matters contained in the administrative record. As to clarification of the grounds on which the exemption was denied, petitioner has totally failed to convince us that there is any need, much less good cause, for additional evidence. With respect to additional evidence concerning the royalty payments, our view of the facts, see p. 1081 *infra*, renders irrelevant the question of the reasonableness of the royalty payments. Thus, additional evidence on this point would not affect our decision herein. Accordingly, the affidavits will not be considered.[11] See *Virginia Professional Standards Review Foundation v. Blumenthal*, 466 F. Supp. 1164 (D. Colo. 1979, 43 AFTR 2d 79–682, 79–1 USTC par. 9167); *General Conference of the Free Church of America v. Commissioner*, 71 T.C. 920, 929 (1979); *Church in Boston v. Commissioner*, 71 T.C. 102, 104–106 (1978).

Petitioner complains that the entire administrative proceeding preceded the passage of section 7428 and the adoption of our Rules governing declaratory judgment proceedings relating to organizations claiming exemption under section 501(c)(3). That section was adopted on October 4, 1976, and our Rules were made available to the public on June 13, 1977. Furthermore, respondent's detailed regulations regarding the information required to be submitted to the Internal Revenue Service were in effect prior to the latter date. See *Houston Lawyer Referral Serv. v. Commissioner, supra* at 576–577. Thus, petitioner had the opportunity, prior to the issuance of the June 27, 1977, final determination, to seek to modify its request for reissuance of the prior determination in order to augment the administrative record. See n. 3 *supra*.

Petitioner also makes some vague claim that the administrative record may not be complete. If petitioner really believed this was the case, its counsel should not have stipulated that the

---

[11]Similar reasoning results in the denial of petitioner's motion for trial to present additional evidence, covering the same ground, filed on June 19, 1978.

materials submitted to the Court "constitute * * * the entire administrative record." See Rule 217(b)(1), Tax Court Rules of Practice and Procedure.

What remains, then, is a motion for summary judgment by each party on the basis of the pleadings and administrative record. While it is true that Rule 217(b)(2), Tax Court Rules of Practice and Procedure, provides that an action for declaratory judgment may be disposed of on a motion for summary judgment, such a motion is pointless under the circumstances of this case. See *Pulpit Resource v. Commissioner*, 70 T.C. 594, 602 (1978).[12] Therefore, the Court will treat the case as submitted for disposition on the administrative record. See Rules 212 and 217(b), Tax Court Rules of Practice and Procedure. The parties' motions for summary judgment accordingly are denied.

We turn now to the merits of the case. Section 501(c)(3) requires, in pertinent part, that to qualify for tax exemption, under section 501(a), an organization must be organized and operated exclusively for certain enumerated purposes (e.g., charitable, religious, educational) and no part of its net earnings may inure to the benefit of any private shareholder or individual. In his original adverse determination respondent stated: "We do not question the educational activities of the corporation [petitioner]"[13] and on brief he specifically states that he "does not contend that petitioner was not organized exclusively for an exempt purpose." The crux of his adverse determination is his conclusion that petitioner has a substantial commercial purpose, serves private rather than public interests and, therefore, is not operated exclusively for an exempt purpose. Petitioner contends that respondent's determination is erroneous because none of its members benefited from its activities and it is unrelated to, and dealt at arm's length with, International, a for-profit corporation. The burden of proof is on petitioner. Rule 217(c), Tax Court Rules of Practice and Procedure.

The operational test (see sec. 1.501(c)(3)–1(c), Income Tax

---

[12]We note in passing that where good cause is shown for augmenting the administrative record, the presentation of augmentation material may be susceptible to submission by way of affidavit. Under such circumstances, a motion for summary judgment may well be the proper procedural vehicle and nothing in *Pulpit Resource* precludes such a course of action.

[13]Notwithstanding this concession, respondent has argued on brief that petitioner's activities are not educational within the meaning of sec. 501(c)(3). We have given no consideration to this argument. In light of our decision herein in respondent's favor on other grounds, this argument would not affect the outcome of the case.

Regs.) focuses on the purpose rather than the nature of an organization's activities. *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 356–357 (1978). Whether the operational test has been satisfied is a question of fact. *Christian Stewardship Assistance v. Commissioner*, 70 T.C. 1037, 1042 (1978); *Pulpit Resource v. Commissioner, supra* at 602. Some of the decided cases have articulated the applicable test in terms of the existence of a substantial nonexempt purpose, regardless of the number or importance of exempt purposes. See *Better Business Bureau v. United States*, 326 U.S. 279 (1945); *Christian Manner International, Inc. v. Commissioner*, 71 T.C. 668 (1979); *Christian Stewardship Assistance v. Commissioner, supra* at 1040; *Fides Publishers Assn. v. United States*, 263 F. Supp. 924, 935 (N.D. Ind. 1967). But see *San Francisco Infant School v. Commissioner*, 69 T.C. 957, 965–966 (1978), holding that a substantial nonexempt activity which was an integral and inseparable part of an exempt activity did not result in denial of tax exemption. Other cases have phrased the test in terms of whether an organization's primary purpose is exempt or nonexempt. See *American Institute for Economic Research v. United States*, 157 Ct. Cl. 548, 555, 302 F.2d 934, 938 (1962); *Scripture Press Foundation v. United States*, 152 Ct. Cl. 463, 469, 285 F.2d 800, 804 (1961). See also *Elisian Guild, Inc. v. United States*, 412 F.2d 121, 124 (1st Cir. 1969); *B.S.W. Group, Inc. v. Commissioner, supra* at 357; *Afro-American Purchasing Center, Inc. v. Commissioner*, T.C. Memo. 1978–31. Whatever confusion may flow from such differing articulations (see *B.S.W. Group, Inc. v. Commissioner, supra* at 357 n. 2), we find it unnecessary, under the circumstances herein, to dwell upon the semantic distinctions involved because we are satisfied that, under either test, petitioner fails to satisfy its burden of proof that it meets the requirements of section 501(c)(3).

The mere fact that an organization engages in a trade or business does not result in denial of tax-exempt status if such trade or business is in furtherance of such organization's exempt purposes. Sec. 1.501(c)(3)–1(e)(1), Income Tax Regs. However, an organization whose net earnings inure to the benefit of private shareholders or individuals or which is operated for the benefit of private interests is not operated exclusively for exempt purposes. Sec. 1.501(c)(3)–1(c)(2) and (d)(1)(ii), Income Tax Regs.

The parties' dispute herein centers on petitioner's payments to

International, a for-profit corporation. Petitioner claims that it has no connection, direct or indirect, with EST, Inc., or International and that its transactions with International are reasonable and represent the fair market value of the rights and services it receives in return. On this premise, petitioner argues that it has no commercial purpose of its own, that its payments to International are analogous to ordinary and necessary business expenses, and that the fact that International may make a profit is not a ground for denying petitioner tax-exempt status. Respondent claims that petitioner is part of a franchise system which is operated for private benefit and that its affiliation with this system taints it with a substantial commercial purpose. We agree with respondent.

To accede to petitioner's claim that it has no connection with International is to ignore reality. While it may be true that they are not formally controlled by the same individuals, International exerts considerable control over petitioner's activities. It sets the tuition for the standard training and requires a minimum number of such trainings. It requires petitioner to conduct regular seminars and to host special events. It controls the programs conducted by petitioner by providing trainers who are salaried by and responsible to EST, Inc., and it further controls petitioner's operations by providing management personnel who are paid by and responsible to EST, Inc. In short, petitioner's only function is to present to the public for a fee ideas that are owned by International with materials and trainers that are supplied and controlled by EST, Inc. Under these circumstances, it can hardly be said that petitioner has made payments to a corporation with which it had no connection whatsoever. Compare *Science and Research Foundation, Inc. v. United States*, 181 F. Supp. 526, 529 (S.D. Ill. 1960), upon which petitioner relies. Moreover, we note that petitioner's rights vis-a-vis EST, Inc., International, and PSMA are dependent on the existence of its tax-exempt status—an element that indicates the possibility, if not likelihood, that the for-profit corporations were trading on such status. See and compare *Berenson v. Commissioner*, 507 F.2d 262, 268–269 (2d Cir. 1974), revg. in part on other grounds 59 T.C. 412 (1972). See also *Commissioner v. Brown*, 380 U.S. 563 (1965), Judge Harlan concurring, at 579–580, and Judge Goldberg dissenting, at 580.

Nor can we agree with petitioner that the critical inquiry is

whether the payments made to International were reasonable or excessive. Regardless of whether the payments made by petitioner to International were excessive,[14] International and EST, Inc., benefited substantially from the operation of petitioner. According to the licensing agreement, International was in a position to license petitioner for a maximum of 10 years. At the end of that time, the agreement terminated unless it had been terminated prior thereto in accordance with the provision permitting termination at any time upon 90 days' notice. See par. 2 of the licensing agreement, p. 1072 *supra*. Upon termination, all copyrighted material, including new material, is required to be transferred to EST, Inc., or International. Although petitioner would be reimbursed at cost for all new developments, it has no right to the continued use of such developments. Furthermore, petitioner is required to use its excess funds for the development of "est" or related educational and scientific research. To the extent that petitioner's activities increase interest and participation in "est" and to the extent petitioner further develops "est," the ultimate beneficiaries are EST, Inc., International, and PMSA, the corporations in which the rights to "est" remain. Cf. *Founding Church of Scientology v. United States*, 188 Ct. Cl. 490, 498, 412 F.2d 1197, 1201 (1969).

Other factors indicate that petitioner is operated for a commercial purpose. Trainers and local organizations are required to sign an agreement not to compete with "est" for 2 years after terminating their relationship with "est" organizations. Petitioner does not expect to derive funds from donations, as is typical of section 501(c)(3) organizations, but rather will depend upon tuition and lecture fees. See *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. at 359. Moreover, tuition for the standard training is set by a for-profit corporation and fees for lectures are set, not with regard to recouping costs, but with regard to the eminence of the speaker. See *Forest Press, Inc. v. Commissioner*, 22 T.C. 265, 267 (1954).

---

[14]We also note that petitioner's argument as to reasonableness is based on the assertion that the payments did little more than reimburse the recipient for its out-of-pocket costs. Assuming that the fact conforms to the assertion (and the administrative record seems to validate this assumption), there is no indication whatsoever of the constituent elements of such costs upon the basis of which a determination of reasonableness might be made. Cf. *Founding Church of Scientology v. United States*, 188 Ct. Cl. 490, 497, 412 F.2d 1197, 1200–1201 (1969). For aught that appears in the administrative record, such costs could have been inflated. See *Hancock Academy of Savannah, Inc. v. Commissioner*, 69 T.C. 488, 495 (1977).

We do not question the sincerity or dedication of petitioner's members. But it is petitioner's activities and not its members' devotion to their work that determines whether it is entitled to exemption from taxation. *Scripture Press Foundation v. United States,* 285 F.2d at 804. We find that petitioner has entered into a business; that it may have done so unwittingly is beside the point. *American Institute for Economic Research v. United States,* 157 Ct. Cl. at 556, 302 F.2d at 938. This is not a case where an organization engaged in an admittedly exempt activity also engages in a nonexempt activity closely associated with, and incidental to, its exempt purposes. See *Saint Germain Foundation v. Commissioner,* 26 T.C. 648, 658 (1956). Cf. *San Francisco Infant School, Inc. v. Commissioner,* 69 T.C. 957 (1978). Petitioner's income-producing activities are not incidental to its educational activities but are the very justification for its existence. See *American Institute for Economic Research v. United States,* 157 Ct. Cl. 548, 302 F.2d 934 (1962); *Fides Publishers Assn. v. United States,* 263 F. Supp. 924 (N.D. Ind. 1967).

As we view this case, petitioner was simply the instrument to subsidize the for-profit corporations and not vice versa and had no life independent of those corporations. See and compare *Science and Research Foundation, Inc. v. United States,* 181 F. Supp. at 529. See also *Christian Manner International, Inc. v. Commissioner,* 71 T.C. 667 (1979).

We hold that petitioner is not operated exclusively for exempt purposes.[15]

*Decision will be entered for the respondent.*

---

[15]On Nov. 17, 1978, we denied petitioner's motion to substitute document. The administrative record contains an unsigned copy of a licensing agreement between "est, an educational corporation, a Nevada Corporation, and est of Hawaii, an Hawaiian Corporation." The document that petitioner sought to substitute was an executed copy of a licensing agreement between the same parties and with similar, although not identical, terms. Even if we had granted petitioner's motion, we would reach the same result herein. We have not way of determining, from the administrative record, the relationship between est and est OF HAWAII, the tax status of est, the operations of est or its relationship with for-profit corporations involved in "est" activities. Although the licensing agreement provides that contributions the licensee makes to est shall be compensated at fair market value (rather than at cost as in the agreement with International) and that the licensee shall pay its pro-rata share of the licensee's overhead (rather than one-half its proceeds as in the agreement with International), petitioner has not satisfied us that the ultimate beneficiary of petitioner's activities is not for-profit corporations in whom the rights to "est" ultimately reside.