*An appropriate order has been issued.*

WORLD FAMILY CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28947–81X. Filed December 14, 1983.

*Woodford G. Rowland*, for the petitioner.

*Thomas H. Meyerer* and *Henry G. Salamy*, for the respondent.

OPINION

NIMS, *Judge*: Petitioner brought this action for a declaratory judgment pursuant to section 7428[1] and Rule 211 on the ground that respondent had failed to determine whether petitioner qualifies as an organization exempt from taxation under sections 501(a) and 501(c)(3). The issues presented are whether petitioner is operated exclusively for religious, charitable, scientific, or other exempt purposes and whether part of petitioner's net earnings inures to the benefit of private individuals.

This case is submitted for decision on the stipulated administrative record pursuant to Rule 122. The administrative record is incorporated herein by this reference. The evidentiary facts and representations contained in the record are assumed to be true for the purposes of this proceeding. See Rule 217(b)(1).

Petitioner World Family Corp. (WFC) was organized as a nonprofit corporation in Utah on December 13, 1977. On November 27, 1978, it submitted to respondent an application for recognition of exemption under section 501(c)(3) (Form 1023). During the following 2 years, respondent requested and petitioner supplied supplemental information on two occasions. Finally, on November 30, 1981, petitioner filed the petition in this case, having exhausted its administrative remedies in accordance with the requirements of section 7428(b)(2).[2] At the time its petition was filed, WFC had its principal office at Salt Lake City, Utah.

Petitioner essentially is a fundraising and fund dispensing organization. Its primary purpose is to provide grants and

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended. All references to Rules are to the Tax Court Rules of Practice and Procedure, except as noted.

[2] Respondent had failed to act on petitioner's application for exemption for nearly 3 years, a period well in excess of the 270 days prescribed by the statute. Respondent concedes this point in his brief and acknowledges that he therefore has the burden of proof in this case. See Rule 217(c)(2)(ii).

interest-free loans to missionaries sent out by the Church of Jesus Christ of Latter-Day Saints (hereinafter the LDS Church).[3] The administrative record shows the missionary program of the LDS Church to be conducted as follows:

Each congregation (known as a Ward, of which there are thousands in the Church), is headed by a Bishop. It is the policy of the Church to have all worthy young men, who are able, fulfill a two year full time mission for the Church at about age 19, and some worthy young women who are able to fulfill an 18 month full time mission for the Church at about age 21. The Bishop in each Ward keeps track of the young people as they grow up and notifies the Church headquarters of those who fulfill these qualifications. Thereafter the call to fulfill a mission comes directly from the First Presidency of the Church. Any given missionary may be called to any of the hundreds of missions throughout the world, and this is controlled solely by the Church. * * *

The primary work of a missionary is to make contact with people in the assigned area and teach them the doctrines of the Church, i.e., Christianity, to the end that such people will be converted and become members of the Church. This is full time for approximately two years. By full time it is meant not just a 40 hour week but basically all day, seven days a week.

The missionaries are always dispatched to locations away from their homes and they are obliged to meet their own expenses. Most missionaries are supported by their parents, but some must look to other sources for financial assistance.

The availability of financial assistance from WFC will be communicated to prospective missionaries through the bishops of the various wards. Candidates will apply to the board of trustees of petitioner, which will select missionaries for assistance "based on need, recommendations from church leaders, availability of funds and various other factors." The dollar value of a grant or loan will vary with the cost of living in the missionary's assignment area, the missionary's other sources of support, and the availability of funds in WFC's treasury. The amounts will be calculated to provide bare subsistence; the average grant or loan is anticipated to be "in the neighborhood of $3,000 to $5,000." The funds will be disbursed monthly either directly to the missionaries in the

---

[3]The Church of Jesus Christ of Latter-Day Saints is an organization exempt from tax and qualifying under sec. 170(c) as an organization contributions to which are deductible. See Internal Revenue Service, Pub. No. 78, Cumulative List of Organizations (1977).

field or to their immediate supervisors to be dispensed to the missionaries at the supervisors' discretion.

As a subordinate and unrelated activity, petitioner also contemplates providing "grants and interest free loans to applicants conducting scientific research in the area of new energy sources and energy conservation." Specifically, WFC hopes someday to "undertake research in the area of nuclear fusion." Applicants will be selected by the board of trustees and "will be required to agree in writing that the results of the research will belong to the corporation to be made available to the public generally on a non-discriminatory basis." In its application for exemption, petitioner indicated that applicants will be selected in a manner similar to the selection of missionaries.[4]

Throughout its communications with respondent, petitioner has emphasized the subordinate position that the research effort holds in its plans: "It is in a secondary position to the missionary effort and will not be undertaken until and unless sufficient funds are available."

Petitioner estimates that its net income will be disbursed in approximately the following proportions:

| | |
|---|---|
| Administrative, clerical, legal, and accounting expenses | 25% |
| Missionary support program | 65 |
| Scientific research | 10 |
| | 100 |

Because of the primary emphasis on the missionary support program, scientific research will receive an even smaller proportion of petitioner's funds when petitioner's income is low.

Three out of an authorized seven trustees have been elected to petitioner's board. They are David Yeaman, president and incorporator of petitioner, Richard Greene, an accountant, and David Day, an attorney. All three men are former LDS missionaries.

Petitioner already has received some contributions in kind but has not yet converted them and dispensed the proceeds.

---

[4] As noted earlier, missionaries are to be selected on the basis of "need, recommendations from church leaders, availability of funds and various other factors." The relevance of some of these considerations for the selection of research scientists is not explained.

The contributions to date are: (1) 211,199 shares of Toluco, Inc., stock valued at $1 per share during November 1978, and (2) 20,000 shares of Phoenix Co. stock valued at "Bid $1\frac{1}{8}$, Ask $1\frac{5}{8}$" per share on September 29, 1978.[5]

Petitioner plans a fundraising program based on mail solicitations to church and community leaders, business people, and others. To attract fundraisers, petitioner also "has plans to offer commissions of up to 20 percent." In response to a question from respondent, petitioner justified its commissions program as follows:

We believe that paying a commission gets the job done better than just hiring solicitors. We have considered the possibility to hire people on a set salary to do solicitation may be less expensive, and it is possible that at some time in the future the company may switch to such a system, however presently the company believes that the commission system better meets its needs—for one thing it doesn't cost anything if the solicitation fails.

Petitioner does not require that fundraisers keep records of their time and expenses: "Since the payment of the fee is strictly a contingency, World Family is not concerned whether the individual spends a dollar, ten thousand dollars, ten minutes or ten weeks."

Petitioner's president, David Yeaman, was responsible for procuring the contributions of stock currently constituting the assets of the company. Accordingly, petitioner's balance sheet carries an accounts payable item due David Yeaman for a commission of $20,000.[6]

An organization may qualify for exemption from Federal income tax under sections 501(a) and 501(c)(3) if (1) it is organized and operated exclusively for one or more exempt purposes, e.g., religious, charitable, scientific, or educational purposes, among others; (2) no part of its net earnings inures

---

[5]Petitioner estimates that the value of these contributions "would more than likely be less than 2 percent of the total donations given to the company during any given year" once active solicitation commences. Given the market values for 1978 and assuming the bid price for the Phoenix Co. stock is accurate, this would mean petitioner expects a yearly income in excess of $11.6 million.

[6]Petitioner's Form 1023 listed the gift of Toluco, Inc., stock as petitioner's only asset, and gave its value as "unknown." (Information about the gift of Phoenix Co. stock was only provided later in correspondence with respondent.) The $20,000 apparently represented an approximation intended to equal 10 percent of the value of the donation. Petitioner does not explain why Mr. Yeaman was credited with only a 10-percent commission, except to say that its policy is only to offer commissions of *up to* 20 percent. No commission has yet been paid to Mr. Yeaman.

to the benefit of any private shareholder or individual; and (3) it devotes no substantial part of its activities to political or lobbying activity. Respondent opposes petitioner's application for exempt status with respect to only the first two of these requirements. We disagree with respondent for the reasons set out below.

## A. EXEMPT PURPOSES

The regulations interpret section 501(c)(3) to impose a conjunctive standard on organizations seeking tax-exempt status; such organizations must satisfy the separate requirements of being both organized exclusively and operated exclusively for one or more exempt purposes. Sec. 1.501(c)(3)–1(a)(1), Income Tax Regs. Respondent does not contest petitioner's qualification under the organizational test. Accordingly, we restrict our discussion to petitioner's qualification under the operational test.

Although section 501(c)(3) uses the words "operated exclusively," an organization will be regarded as satisfying the operational test if it engages *primarily* in activities which accomplish one or more exempt purposes specified in section 501(c)(3). Sec. 1.501(c)(3)–1(c)(1), Income Tax Regs. If only an insubstantial part of an organization's activities is directed to a nonexempt purpose, it will not be disqualified from exemption. See *Better Business Bureau v. United States*, 326 U.S. 279 (1945). See also *Copyright Clearance Center v. Commissioner*, 79 T.C. 793, 804 (1982); *Presbyterian & Reformed Publishing Co. v. Commissioner*, 79 T.C. 1070, 1082 (1982).

### 1. Missionary Support Program

Respondent contends that petitioner has not described its proposed missionary support program in sufficient detail to permit this Court to conclude that petitioner will be operated for public rather than private interests. We disagree.

Respondent concedes that funding exempt activity can itself constitute an exempt activity. See Rev. Rul. 73–285, 1973–2 C.B. 174.[7] Indeed, respondent has specifically recognized that providing support to missionaries is a charitable activity:

---

[7]On brief, respondent makes much of petitioner's lack of formal affiliation with the LDS Church. The significance of this fact for the issue of exempt status is not at all clear. In any

It has long been a recognized principle in the field of religious charities that assistance of the religious work of missions abroad is a charitable object, whether undertaken by general assistance for such purposes, or by support of particular aspects of the programs of such missions. Thus, trusts providing for the payment of compensation of missionaries of a particular mission, or for the support of some specific aspects of the religious work of a religious body, are commonly recognized as charitable. [Rev. Rul. 75–434, 1975–2 C.B. 205, 206.]

Respondent maintains, however, that "the description of how the * * * funding activities will be operated leaves a great deal to be desired." Respondent's procedural regulations provide in part:

Exempt status will be recognized in advance of operations if proposed operations can be described in sufficient detail to permit a conclusion that the organization will meet the particular requirements of the section under which exemption is claimed. [26 C.F.R. sec. 601.201(n)(1)(ii) (1982).]

See also sec. 1.501(c)(3)–1(b)(1)(v), Income Tax Regs.; Rev. Proc. 80–25, 1980–1 C.B. 667, section 5.02. Respondent invokes the language of this Court in *Church in Boston v. Commissioner*, 71 T.C. 102 (1978), in which we warned that "failure to develop criteria for disbursements of grants or to keep adequate records * * * can result in abuse." 71 T.C. at 107.

We are satisfied here that petitioner has established criteria adequate to guard against abuse; petitioner's proposed missionary support program is described in more than sufficient detail. Indeed, we find it difficult to imagine what additional details respondent requires. Petitioner has described the manner in which recipients will be selected, the anticipated source of funds, and the nature of the contemplated expenditures.

Missionaries of the LDS Church are selected by bishops of the church according to a longstanding and well-known Mormon tradition of which we take judicial notice. These missionaries devote their energies full time to spreading

event, respondent has elsewhere found such an affiliation to be unnecessary. In the Revenue Ruling cited in the accompanying text above, the respondent confirmed exempt status for an organization which provided funds for the legal defense of members of a particular religious sect, despite that "None of the members of the organization belongs to the religious sect." See also Rev. Rul. 75–434, 1975–2 C.B. 205.

Christian doctrine, an exempt activity with an exempt purpose as respondent acknowledges. See Rev. Rul. 75–434, 1975–2 C.B. 205. Recipients of petitioner's financial assistance will be selected from among those individuals called by the LDS Church; respondent presumably does not challenge the religious character of the LDS Church's missionary program. Awards of loans or grants will be adjusted to account for a missionary's other sources of income. Amounts will be calculated to provide bare subsistence; diversion of the funds (approximately $3,000 to $5,000 per missionary) to nonexempt purposes is highly unlikely.[8] Respondent does not dispute these representations in the administrative record and therefore they must be accepted as true.

We denied exempt status to the petitioner in *Church in Boston*, as we have in other cases, for failure to provide sufficient information. See *General Conference of the Free Church of America v. Commissioner*, 71 T.C. 920 (1979); *Levy Family Tribe Foundation v. Commissioner*, 69 T.C. 615 (1978); *Basic Bible Church of America v. Commissioner*, T.C. Memo. 1983–287 (1983). Each of those cases, however, involved circumstances sharply distinct from this case. We were persuaded to rule unfavorably where the petitioning organization was uncooperative in providing information. *Church in Boston v. Commissioner, supra; General Conference of the Free Church of America v. Commissioner, supra; Basic Bible Church of America v. Commissioner, supra*. In this case, petitioner has cooperated fully with respondent. We have also been persuaded to rule unfavorably where the nature of the proposed activities is especially ambiguous. *Levy Family Tribe Foundation v. Commissioner, supra*. In this case, the religious purpose of the missionary support program is plain.

Accordingly, we find petitioner's proposed missionary support program to be adequately described in the administrative record, justifying the conclusion that it is operated exclusively for exempt purposes. *Dumaine Farms v. Commissioner*, 73 T.C. 650, 664 (1980).

---

[8]Missionaries apparently are supervised while in the field. Petitioner informed respondent that, in addition to maintaining the level of assistance at subsistence aid, additional protection against diversion of funds will be provided by "cross check[ing] the individual's activities and expenses reported with information available to such supervisors."

## 2. Scientific Research Funding

Petitioner contends that its proposed scientific research funding activity will be insubstantial in relation to its missionary assistance effort and therefore should not jeopardize its application for exemption under section 501(c)(3). Alternatively, petitioner argues that the activity constitutes an exempt activity.

We agree with petitioner that the proposed research funding activity is insubstantial. Accordingly, we do not rule on petitioner's alternative argument.

Initially, we note that funding scientific research constitutes a recognized exempt purpose provided, however, that the research is carried on in the public interest. Sec. 1.501(c)(3)–1(d)(5)(i), Income Tax Regs. The regulations provide:

(iii) Scientific research will be regarded as carried on in the public interest—

(a) If the results of such research * * * are made available to the public on a nondiscriminatory basis;

[Sec. 1.501(c)(3)–1(d)(5)(iii), Income Tax Regs.]

Petitioner's scientific research program does conform to this requirement in that applicants for petitioner's funds "will be required to agree in writing that the results of the research will belong to the corporation to be made available to the public generally on a non-discriminatory basis."

The fact remains, however, that petitioner's program is inadequately described. If petitioner's activities in funding scientific research were substantial, we would be compelled to hold for respondent on this point.[9]

If only an insubstantial part of an organization's activities is directed to a nonexempt purpose, the organization may still be regarded as "operated exclusively" for exempt purposes. *Kentucky Bar Foundation v. Commissioner*, 78 T.C. 921, (1982); *Industrial Aid for the Blind v. Commissioner*, 73 T.C. 96, 102 (1979); see *Better Business Bureau v. United States*, 326 U.S.

---

[9]The presence of an exempt purpose does not alone assure a favorable determination under sec. 501(c)(3). It remains to be seen whether the methods used to further the exempt purpose do not infringe the dictates of that section. See *Science & Research Foundation, Inc. v. United States*, 181 F. Supp. 526, 528 (S.D. Ill. 1960). Petitioner's description of its proposed activities provides no assurance that commercial or private interests will not be furthered.

279 (1945); sec. 1.501(c)(3)–1(c)(1), Income Tax Regs. Neither the Internal Revenue Code nor the regulations nor the case law provide a general definition of "insubstantial" for purposes of section 501(c)(3). This is an issue of fact to be determined under the facts and circumstances of each particular case. See *Kentucky Bar Foundation v. Commissioner, supra; Church in Boston v. Commissioner, supra.*

After careful consideration, we find petitioner's research funding activity to be insubstantial in relation to its exempt religious activities. Petitioner does not intend to engage in funding scientific research in the near future. At peak operations, petitioner anticipates devoting only 10 percent of its expenditures to such funding.[10] The missionary support program will at all times hold a preeminent priority in petitioner's affairs; when revenues are low, research funding will be reduced to less than 10 percent of expenditures. Moreover, we recognize petitioner's good-faith intention to engage in a recognized exempt activity—support of scientific research in the public interest; its application lacked only adequate description to be approved on the alternative ground of exempt purpose.

Finally, we note that respondent carries the burden of proof in this case. Cf. *Dumaine Farms v. Commissioner,* 73 T.C. 650, 660 (1980) ("Since respondent bears the burden of proof with respect to such issues, it is he who must assume the risk that the facts in the record are insufficient to prove his point.").

We emphasize that this holding does not offer petitioner a license for abuse. We note the words of the House report accompanying section 7428:

The judgment of the court in a declaratory judgment proceeding is to be binding upon the parties to the case based upon the facts as presented to the court in the case for the year or years involved. This, of course, does not foreclose Service action for later years (within the limits of the legal doctrines of estoppel and *stare decisis*) if the governing law or the organization's operations have changed since the years to which the

---

[10]We establish no general rule for future cases in finding 10 percent to be insubstantial. We noted a similar caveat in *Church in Boston* in which we found approximately 20 percent of expenditures to constitute more than an insubstantial activity: "We hasten to point out that while the facts in the instant case merit a denial of exempt status to petitioner, we do not set forth a percentage test which can be relied upon for future reference with respect to nonexempt activities of an organization. Each case must be decided upon its own unique facts and circumstances." *Church in Boston v. Commissioner,* 71 T.C. 102, 108 (1978).

declaratory judgment applies, or (especially in the case of a new organization) if the organization does not in operation meet the requirements for qualification. [H. Rept. 94–658 (1975), 1976–3 C.B. (Vol. 2) 977, 978; fn. ref. omitted.]

Accordingly, we find petitioner's proposed research funding activity to be insubstantial and as such not an obstruction to tax-exempt status under section 501(c)(3).

## B. Private Inurement

Section 501(c)(3) requires that no part of the net earnings of an exempt organization inure to the benefit of any private shareholder or individual. The regulations define "private shareholder or individual" as any person "having a personal and private interest in the activities of the organization." Sec. 1.501(a)-1(c), Income Tax Regs. We agree with respondent that David Yeaman, the president and incorporator of petitioner, comes within this definition.

Respondent further contends, however, that petitioner's net earnings will inure to David Yeaman through the fundraising commissions currently credited to him on petitioner's balance sheet. We part ways with respondent at this point.

It is well established that an exempt organization is entitled to pay reasonable compensation for services without endangering its exemption. Such payments are permissible even though they are made to the organization's trustees, officers, or founders; the issue is whether the payments are reasonable.[11]

Whether compensation is reasonable is a question of fact to be determined in light of all the circumstances. Initially, we note that a contingent-fee arrangement made by a tax-exempt entity is not per se unreasonable as respondent appears to contend:

We do not, however, mean to imply that all contingent compensation arrangements made by charitable organizations will preclude tax-exempt status. Such arrangements are a part of business life and must occasionally be paid by a charity to salesmen, publishers, support groups, *and even fund raisers*. [Emphasis added.]

---

[11]See *Saint Germain Foundation v. Commissioner*, 26 T.C. 648, 658–659 (1956). See also *Mabee Petroleum Corp. v. United States*, 203 F.2d 872 (5th Cir. 1953); *Founding Church of Scientology v. United States*, 188 Ct. Cl. 490, 412 F.2d 1197 (1969); *Broadway Theatre League of Lynchburg, Va. v. United States*, 293 F. Supp. 346 (W.D. Va. 1968); *Ecclesiastical Order of the ISM of AM v. Commissioner*, 80 T.C. 833 (1983); *People of God Community v. Commissioner*, 75 T.C. 127, 131 (1980); cf. sec. 4941(d)(2)(E).

*People of God Community v. Commissioner*, 75 T.C. 127, 133 (1980) (petitioner's founder and "pastor" received varying percentages of the gross tithes and offerings adjusted according to his personal needs).

Indeed, contingent fee payments to fundraisers by charities are expressly recognized and regulated by statute in many States. These statutes specifically sanction such commissions and in many cases endorse percentage commissions higher than the 20-percent ceiling proposed here by petitioner. See, e.g., Fla. Stat. Ann. sec. 496.11 (1976) (professional solicitor's total fee shall not be in excess of 25 percent of gross contributions which he solicits, fundraising costs included).[12]

We must consider then whether a commission which may be reasonable when paid to an unrelated third party becomes unreasonable when paid to an individual having a personal and private interest in the payor organization. Although in some circumstances such a finding may be warranted, it is clear that payment to an interested individual does not make a commission unreasonable as a matter of law. We have observed that "One factor to consider [in determining the reasonableness of compensation] is whether comparable services would cost as much if obtained from an outside source in an arm's-length transaction." *B.H.W. Anesthesia Foundation, Inc. v. Commissioner*, 72 T.C. 681, 686 (1979). The law places no duty on individuals operating charitable organizations to donate their services; they are entitled to reasonable compensation for their efforts. See also sec. 4941(d)(2)(E) ("the payment of compensation * * * by a private foundation to a disqualified person for personal services which are reasonable and necessary to carrying out the exempt purpose of the private foundation shall not be an act of self-dealing if the compensation * * * is not excessive").

---

[12]See also Minn. Stat. Ann. sec. 309.555 (1978) (limitation to 30 percent of amount raised); S.D. Comp. Laws Ann. sec. 37–27–24 (1975) (compensation limited to 30 percent of the gross amount of charitable contributions pledged or received by the fundraiser including expenses); Tenn. Code Ann. sec. 48–2213 (1976) ("An amount of a charitable organization's gross contributions expended for fund-raising cost in any fiscal year not in excess of twenty-five percent (25%) of such gross contributions shall create a rebuttable presumption of reasonableness."). See generally E. Fisch, D. Freed & E. Schacter, Charities and Charitable Foundations, sec. 744 n. 74 (1974), and statutes cited there.

In this case, we find the commission arrangement to be reasonable, notwithstanding that petitioner's president and incorporator may reap some of its benefits. Commissions are payable to *any* individual who procures contributions for petitioner; payments are not limited to particular individuals. Moreover, commissions are directly contingent on success in procuring funds and as such are tied to services rendered. These elements distinguish petitioner's commission arrangement from other arrangements found by the courts to constitute private inurement. See *Mabee Petroleum Corp. v. United States*, 203 F.2d 872 (5th Cir. 1953); *Founding Church of Scientology v. United States*, 188 Ct. Cl. 490, 412 F.2d 1197 (1969); *People of God Community v. Commissioner, supra.* In these cases, some percentage of receipts or salary was routinely designated for one dominant individual, and he was entitled to receive this income whether or not he rendered services to the payor organization.[13]

We also note that petitioner's president and incorporator was credited with only a 10-percent commission despite authorization of commissions of up to 20 percent. In addition, we find the State statutes approving commissions to fundraisers of up to 30 percent in some instances to be significant in suggesting that the commission arrangement here is reasonable. This conclusion is buttressed by the soundness of this arrangement for petitioner's operations from a business perspective; commissions are a fundraising incentive well suited to the budget of a fledgling organization. Finally, we again observe that the burden of proof rests with respondent and that he must bear the risk that the facts in the record are insufficient to prove his point. Accordingly, we find that petitioner's commission system does not constitute private inurement in violation of the proscription contained in section 501(c)(3).

*Decision will be entered for the petitioner.*

---

[13]In *Gemological Institute of America v. Commissioner*, 17 T.C. 1604 (1952), affd. 212 F.2d 205 (9th Cir. 1954), a percentage of earnings was earmarked for a dominant individual in a manner arguably related to services rendered. This Court found private inurement, however, because the percentage was so high—50 percent. Such a percentage, especially when specifically designated for only one individual, is clearly unreasonable in contrast to the arrangement in the instant case.