MANNING ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 13332-88X.        Filed November 15, 1989.

*Steven J. Dunn,* for the petitioner.
*Mae J. Lew,* for the respondent.

OPINION

RAUM, *Judge:* The Commissioner determined that petitioner does not qualify for exemption from income taxation under section 501(c)(3).[1] This case is before us on a petition for a declaratory judgment and a stipulation of the parties as to the correctness and completeness of the administra-

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

tive record pursuant to Rule 217. The jurisdictional requirements specified in section 7428 have all been satisfied. At issue is whether petitioner is "operated exclusively for * * * educational purposes" under section 501(c)(3).

The evidentiary facts and representations contained in the administrative record are presumed to be true for purposes of this proceeding, and petitioner has the burden of proving that the Commissioner's determination is in error. *Hancock Academy of Savannah, Inc. v. Commissioner,* 69 T.C. 488, 489, 492 (1977); Rule 217(c)(2)(i). Petitioner's principal place of business at all times relevant has been in Chelmsford, Massachusetts.

Petitioner, Manning Association, Inc. (Manning Association or the association), was incorporated in 1901 "for the purpose of acquiring and preserving the ancient Manning homestead * * * and other historic relics and records of the descendants of William Manning * * * and of encouraging friendly intercourse among his descendants." Membership in the Manning Association is open to any person who is "elected by the Board of Trustees" (and who pays the annual membership dues); however, only descendants of William Manning may own stock in the corporation and only shareholders may vote or hold office.

William Manning arrived in this country from England around the year 1634, and settled in Cambridge, Massachusetts. In 1696 his grandson, Samuel Manning, built a home in North Billerica, Massachusetts, by Chelmsford Road, on land (60 acres) received from his grandfather, and began farming the land. The homestead, a white-trimmed, slant-roofed saltbox, originally consisted of four large rooms, two on the ground floor and two upstairs. A lean-to in the back was added in the 1700's.

In the early 1700's "when Indian outbreaks were still to be feared," the house was officially appointed as a garrison house, to which an allotted number of families could hasten in time of threatened Indian attack. In 1752 the homestead was licensed as a tavern and "did a booming business handling patrons of the Boston-New Hampshire stage coach route." During the Revolutionary War, the homestead was known as the Manning Tavern, and patriot troops and officers are said to have met or visited there.

The home built by Samuel Manning continuously sheltered one branch of the Manning family for approximately 175 years. Lucinda Manning, who was the sole survivor in the old homestead, moved away from it following harassment by "tramps, gypsies, and other molesters [who] subjected her to severe annoyances." None of the contents of the building remained after Lucinda's departure. After Lucinda's death in 1880 the homestead passed to "trustees who were to lease it and devote the proceeds to 'public worship and religious instruction'."

From 1880 to 1899 the house deteriorated rapidly. Late 19th Century photographs show a house on the way to collapse. Squatters took over the building and at one time the occupants raised chickens. During this forsaken period, a group of college students tried to set fire to the then-deserted old house but were prevented by passers-by. This incident was reported in the Boston newspapers and caught the attention of some of the Manning descendants.

In 1898, Warren H. Manning, a prominent landscape architect and one of the descendants, called a preliminary meeting of Mannings in which the plight of the homestead was brought to the family's attention. In the call for the meeting it was stated that "the house could well be made a place of pilgrimage for Mannings, where relics of the family could be brought together and meetings of the descendants of William Manning held." After that meeting, two more meetings were held in late 1898 and early 1899. At these meetings, the Mannings decided to create a permanent organization and it was reported that the trustees who held title to the homestead, under the will of Lucinda Manning, had been persuaded to transfer the property back to the Mannings.

In May 1899, Warren H. Manning leased the house from the trustees and began making repairs. The first annual meeting and reunion at the old homestead took place on June 18, 1900. In 1900 Warren H. Manning gave the old homestead the name "Manning Manse". The quaint term "manse" has since been used by members of the Manning family and certain others in referring to the house; it will be similarly used hereinafter from time to time, without,

however, any intention of imparting any historic significance to the term.

The first issue of the Manning Manse Messenger, a newsletter published by petitioner, contains a brief history of the Manning Association. In that newsletter, dated June 1925, it explains how petitioner came to be. It states that "Warren H. Manning in 1900 consulted with David Manning, an attorney of Worcester, Massachusetts, who advised securing a special act * * * and he as a senator in our State legislature secured enactment, on March 4 [1901] of a bill in which the petitioners 'and their association and successors are hereby made a corporation by the name of the Manning Association'." Thereafter, title to the property appears to have passed to the Manning Association.

At the second annual reunion held on June 17, 1901, the formal organization of the Manning Association, Inc., was made more complete. A family history explains that "The idea was to make the old homestead the property, not of a few individuals, but of the whole family." After Warren Manning's renovations were completed, he issued a call to family members for furniture, pictures, and tools that could be displayed in the old house. In response, more than 2,000 pieces were sent from all over the country. Subsequent donations and acquisitions increased the collection of related artifacts to over 4,000 items. They included colonial furnishings, such as furniture, household articles, documents, paintings, tools, and utensils. Annual meetings of the Manning family have been held at the homestead. Extensive matters relating to the family, summarized in greater detail hereinafter, were pursued through a newsletter, the gathering of genealogical data, the accumulation of family memorabilia, and the production and sale of such items as Manning Manse notepaper, Manning Manse cookbooks, Story of the Manse, bookplates, and Manning coat-of-arms. A tearoom was opened in the house, and was operated from 1909 to 1939, when it was closed at the beginning of World War II. The family history states that "after December 7th of 1941, the world changed for every human being then living. For the moment, ancestry was forgotten." After the war, the building was again opened up

as a business, and since 1948 a number of restaurants have been operated therein.

The needs of the businesses conducted in the homestead have brought about a number of changes. In 1960 a large new one-story building containing a modern dining room was added to the house. From photographs in the record it appears to be at least as long as, if not longer than, the house itself. Paved parking lots, public restrooms, and handicap ramps have been added. Also, extensive landscaping work has been done. Petitioner plans to add a new 300-seat banquet hall.

A 10-year lease of the premises, dated October 14, 1979, to a private restaurateur, Manning Tavern, Inc., DBA Manning Manse Tavern, describes the property as:

consisting of an antique house with dining room addition and about 3.9 acres of land, including parking lot, to be used exclusively for the operation of a restaurant, * * * BUT NOT INCLUDING such antiques and other personal property as may be owned by Manning Association, which the association may permit to remain on the premises or remove from time to time, at its discretion. The dining room addition and the present kitchen may be used for any restaurant purpose; thé remaining five rooms on the first floor of the old house shall be used only for exhibition purposes or accessory kitchen facilities, except that the room to the right of the front entrance may be used to serve private parties only. The rooms on the second floor are to be used solely for residential use by an authorized caretaker. * * *

The lessee was owned or controlled by several members of the Kelley family, not shown to have any relationship or other connection with the Manning family. It was given the right to renew the lease for two additional periods of 5 years each at increased rent based upon a percentage of increases in the cost of living index. The lessee was also given the right of first refusal to purchase the premises, subject to the superior right of any member of the Manning Association to purchase the property. The rent in the original 1979 lease and amendments thereto was fixed in terms of increasing amounts up to a point of the greater of a specified fixed amount and 6 percent of gross sales per month with a maximum of $3,000 per month. In the amendments the lessee agreed to make specified improvements to the property, such as expansion of the rear parking lot, landscaping, fencing, storm windows, conver-

sion from oil to gas, completion of new men's and ladies' rooms, installation of a new high pressure boiler with zone controls for each floor and the restaurant. It also agreed to repay $15,000 towards replacing the septic tank serving the homestead.

From a menu and other materials in evidence it is obvious that the lessee-restaurant has exploited the historic origins of the homestead and use of the artifacts in promoting the restaurant to the public. Many of the artifacts have been used to furnish the homestead and the restaurant. The objects thus on display do serve an educational purpose, but they also serve a substantial, if not greater, commercial objective of helping to create an ambiance for the restaurant in its attempt to attract and increase patronage for its business enterprise, in which petitioner has a direct interest as a result of potentially increased rents from a percentage of the restaurant's gross sales. The remaining items are stored on loan to the Lowell University Library, in Lowell, Massachusetts, for display and research, pending their return to the homestead when suitable security and protection can be provided for them. Such items at the University Library serve an educational purpose. It is not possible in the record before us to compare the relative percentage of items at the restaurant and homestead with that of the items at the University Library.[2]

In 1982, the Massachusetts Historical Commission accepted the "Manning Manse" for inclusion in the National Register of Historic Places.

---

[2]The record is confusing and apparently contradictory in this connection. In one of the stipulated exhibits contained in the administrative record it was stated that in respect of the association's collection of over 4,000 artifacts, its income for preservation projects was inadequate and that some artifacts had to be sold during the depression years of the 1930's and the war years of the 1940's to meet mortgage payments. It was then stated that "Most of the remaining inventory is used to furnish the Homestead and restaurant; but several hundred items are in storage awaiting installation of security and fire protection systems before displaying to the general public." And apparently in reference to the same items later on that page, it is stated that "several hundred historical documents and utensils are currently on loan to Lowell University Library * * * [which] have been used by researchers and students." Yet, later in that document reference is made to "our inventory of the 10,000 plus items on loan to Lowell University Library and return the collection to the Manse when feasible." There is further confusion as a result of the report that many artifacts "were stolen during World War II when no Manning was nearby to watch over the property" and that "other items were sold at auction in 1960 * * * and used the proceeds to re-clapboard and re-roof the Manse." The confusion and unexplained apparent discrepancy in the figures are baffling, and to the extent that anything may be thought to turn upon the numbers involved, petitioner has failed to establish a sufficiently coherent administrative record for this purpose.

The following table (derived from petitioner's application for exemption) shows petitioner's receipts and expenditures for the years 1981-1985:

RECEIPTS

|  | 1981 | 1982 | 1983 | 1984 | 1985 (to 6/30/85) |
|---|---|---|---|---|---|
| Gross contributions, gifts, and similar amounts received | $415.00 | - - - | $375.00 | - - - | - - - |
| Gross dues and assessments of members | 419.00 | 1,234.76 | $577.00 | $782.10 | $30.00 |
| Rent | 21,000.00 | 24,000.00 | 38,976.00 | 38,976.00 | 19,488.00 |
| Investment income | 431.93 | 1,569.94 | 2,497.71 | 5,423.50 | 1,732.63 |
| Other revenue (stock and miscellaneous) | 122.80 | - - - | 181.80 | 73.60 | 660.69 |
| Total | 22,388.73 | 26,804.70 | 42,607.51 | 45,255.20 | 21,911.32 |

EXPENDITURES

|  | 1981 | 1982 | 1983 | 1984 | 1985 (to 6/30/85) |
|---|---|---|---|---|---|
| Real estate tax | 3,728.88 | 3,251.19 | 6,717.50 | 6,717.50 | - - - |
| Mass. Corp. fee (plus recording fee for 1983) | 10.00 | 10.00 | 20.20 | - - - | - - - |
| Postage, phone, office supplies, etc.—including meeting for 1981 and Messenger for 1984 | 230.70 | 202.95 | 235.80 | 791.33 | 231.85 |
| Messenger (Manning family newsletter) | - - - | 343.63 | 382.68 | (included above) | - - - |
| Annual meeting | (included above) | 75.00 | 96.10 | 110.50 | - - - |
| Insurance | 568.00 | 584.00 | 692.00 | 1,712.00 | 230.00 |
| Painting (including restoration) | 4,024.08 | 1,150.00 | 350.00 | 150.00 | - - - |
| Dryden Chapel | 25.00 | - - - | - - - | - - - | - - - |
| Door repair | 1,040.34 | - - - | - - - | - - - | - - - |
| Interest | 931.39 | - - - | - - - | - - - | - - - |
| Coat of arms | - - - | 196.56 | - - - | - - - | - - - |
| Stock certificates | - - - | 17.33 | - - - | - - - | - - - |
| Restoration report | - - - | 150.00 | - - - | - - - | - - - |
| Tax return | - - - | 50.00 | - - - | - - - | - - - |
| Repairs | - - - | 3,138.75 | 985.00 | - - - | - - - |
| Parking lot repairs | - - - | - - - | 5,314.50 | - - - | - - - |
| Genealogy | - - - | 159.00 | - - - | - - - | - - - |
| Principal payment | - - - | 9,214.90 | - - - | - - - | - - - |
| Historic building renovation | - - - | - - - | - - - | 48,338.73 | 18,745.74 |
| Sewerage project | - - - | - - - | - - - | - - - | 30,074.62 |
| Total | 10,558.39 | 18,543.31 | 14,793.78 | 57,820.06 | 49,282.21 |

The rentals represented approximately 86 to 94 percent of petitioner's yearly receipts. The receipts for each of the years 1981, 1982, and 1983, were substantially in excess of expenditures. As to the years 1984 and 1985, the great bulk of the expenditures appear to relate to capital items rather than current expenses (building renovations and sewerage

project), and if proper adjustment is made in respect of these items, petitioner continued to function at a substantial profit for these years. Such profit in all 5 years was attributable primarily to rental income received from the restaurant-lessee.

Section 501(a) provides that organizations described in section 501(c) shall be exempt from taxation. Only section 501(c)(3) is involved in this case. To the extent relevant here, it describes corporations and other specified entities—

organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual * * * . [Emphasis supplied.]

To come within these provisions an entity must be both "organized and operated exclusively" for at least one of the stated purposes. Sec. 1.501(c)(3)-1(a), Income Tax Regs. The only such purpose claimed by petitioner is "educational." There is no question here that petitioner satisfies the organizational test. The sole issue is whether it was "operated exclusively for * * * educational purposes."

The operational test focuses on "the purpose towards which an organization's activities are directed, and not the nature of the activities." *B.S.W. Group, Inc. v. Commissioner,* 70 T.C. 352, 356-357 (1978). Whether an organization satisfies the operational test is a question of fact. *est of Hawaii v. Commissioner,* 71 T.C. 1067, 1079 (1979), affd. 647 F.2d 170 (9th Cir. 1981); *B.S.W. Group, Inc. v. Commissioner,* 70 T.C. at 356-357. At the heart of this case is the word "exclusively." We have no doubt that petitioner's activities did serve some educational purposes. But the issue is whether it was operated "exclusively" for such purposes.

The word "exclusively" has not been literally construed to mean "solely" or "absolutely without exception," *Church in Boston v. Commissioner,* 71 T.C. 102, 107 (1978), and we have recognized that "a nonexempt purpose even perhaps somewhat beyond a de minimis level has been permitted without loss of exemption," *Copyright Clearance Center v. Commissioner,* 79 T.C. 793, 805 (1982). Nevertheless, there is a limit beyond which the statute may not be stretched. That limit was set forth by the Supreme Court in *Better*

*Business Bureau v. United States,* 326 U.S. 279, 283 (1945),[3] as follows:

the presence of a single [nonexempt] * * * purpose, *if substantial in nature,* will destroy the exemption regardless of the number or importance of truly [exempt] * * * purposes. [Emphasis supplied.]

To be sure, a certain amount of confusion may have emerged as a result of attempts in some cases to restate the test in language of "primary," "dominant," or "incidental" terms as applied to the exempt and nonexempt purposes— differences in phraseology that could possibly be thought to be merely semantic, cf. *est of Hawaii v. Commissioner,* 71 T.C. at 1079. Nonetheless, the language of the Supreme Court itself remains intact, and we think we should not stray therefrom. To be entitled to the section 501(c)(3) exemption, an organization must show that "regardless of the number or *importance* of truly [exempt] * * * purposes" (emphasis supplied), there is not present a "single [nonexempt] * * * purpose [that is] substantial in nature."

In our judgment, notwithstanding the presence and "importance" of truly educational purposes served by petitioner's activities, which petitioner has emphasized at length, there remains a nonexempt purpose that, in terms of *Better Business Bureau,* is "substantial in nature [that will] destroy the exemption." We need not dwell upon the educational aspects of petitioner's activities. We accept them as satisfying the statute. The crucial issue is whether the purpose of petitioner's nonexempt activities is "substantial in nature," not whether the purpose of its exempt educational activities is substantial. To frame the issue in different terms might merely befog the problem. We adhere to the formulation stated by the Supreme Court. Of course, some activities may have both exempt and nonexempt objectives. In that situation it is appropriate to consider the extent to which the nonexempt objective component is "substantial" and in any event to combine such component

---

[3]As was pointed out in *Copyright Clearance Center v. Commissioner,* 79 T.C. 793, 804 n. 11 (1982), *Better Business Bureau v. United States,* 326 U.S. 279, 283 (1945), dealt with Social Security taxes, but the statutory language there is comparable to the relevant language in sec. 501, and the test stated by the Supreme Court has been regarded as applicable to sec. 501(c)(3). Cf. cases cited in *Copyright Clearance* at 804 n. 11, *supra.* Cf. also *Phi Delta Theta Fraternity v. Commissioner,* 887 F.2d 1302, 1307 (6th Cir. 1989), affg. 90 T.C. 1033 (1988).

with other related purely nonexempt objectives to determine whether the nonexempt objectives in the aggregate are "substantial."

We must therefore examine petitioner's activities to determine whether there exists a "single noneducational purpose, * * * substantial in nature." A review of the record convinces us that petitioner in fact has been engaged in activities relating to the private interests of the Manning family and its members which may fairly be characterized as nonexempt in purpose and that such nonexempt purpose is, in terms of the *Better Business Bureau* test, "substantial in nature." We proceed to consider some of these activities.

1. *Annual meetings.* The annual meeting, held each June, is referred to in the association's publications as the "annual Manning family reunion." The reports on these annual meetings, submitted as exhibits herein, show that at each annual reunion the "kinfolk" gather at the Manning homestead in North Billerica, Massachusetts, to share a meal with other "clan" members in the Manning Manse restaurant. After this meal, or sometimes during the meal, the annual business meeting is conducted. At this meeting the president welcomes the members, reads a list of the names of those members who had "written their greetings," reads a list of deaths and births since the spring newsletter, urges "kin" to forward vital statistics to the association, and a moment of prayer is held "in memory of all our departed family members." Awards are given to the oldest and youngest "attendees" and to the member who traveled the farthest to attend the reunion. Members who have had birthdays, presumably since the spring family newsletter, are recognized. Other topics of discussion at the reunion are the various repairs and improvements to the homestead and the opportunity to purchase Manning family memorabilia. Also, at this meeting, the treasurer's report is read or submitted, and shareholders, who must be descendants of William Manning, choose new officers and trustees. The officers and trustees must also be descendants of William Manning. The reunion is concluded with a lecture on such topics as old house restoration, the life and times of Warren Manning, and the ancient art of cutting flints by hand.

Granted that some part of these annual family reunions, such as the lectures, may be characterized as serving an educational purpose, the focus of these reunions is undeniably upon the Manning family. Indeed, the association has in fact functioned in accord with the original objective announced by Warren Manning in calling a meeting of the Mannings in 1898 bringing the plight of the homestead to their attention, stating that "the house could well be made a place of pilgrimage for Mannings, where relics of the family could be brought together and meetings of the descendants of William Manning held." The reports on these annual reunions state that the Manning "kinfolk" gathered at the "manse," that "Family members introduced themselves," that "clan" members shared a meal, that "kinsmen" viewed the improvements to the "manse," that "kin" were requested to forward vital statistics to petitioner, and that prayers were said for departed "family members." Further, only descendants of William Manning, who had purchased petitioner's $1 per share stock, were eligible to vote and hold office. Based upon our examination of the entire administrative record, we conclude that family-focused social and recreational purposes constituted a substantial, indeed the major, portion of petitioner's annual meetings and that these activities substantially benefit the private interests of members of the Manning family, thereby advancing a substantial nonexempt private purpose.

2. *Newsletter.* The newsletter (the Manning Manse Messenger) contains information on births, deaths, and marriages in the Manning family as well as genealogical information and requests for Manning family members to send genealogical information to the association. The newsletters also review the reunions, discuss improvements to the homestead, and urge Manning family members to become shareholders and to purchase Manning family memorabilia. One newsletter, dated June 1925, contains pictures of some of the relics that were in petitioner's collection at that time. Like the reunions, the newsletters are to a certain extent educational. However, the newsletters clearly are intended to serve substantial nonexempt purposes such as "encouraging friendly intercourse" among

the descendants of William Manning, promoting family pride, and providing family members with an opportunity to share and receive news.

3. *Genealogy/vital statistics.* One of petitioner's activities is the preservation of historical Manning family records and the updating of vital family statistics. This activity is carried on largely through the newsletters which urge "kin" to forward information on births, marriages, and deaths to the association and which publish genealogical data on the Manning family to assist Manning family members in tracing their roots. The compilation of genealogical data serves the private, and thus nonexempt, purposes of the Manning family. Any educational benefit to the public created by petitioner's genealogical activities is incidental. See *Callaway Family Association, Inc. v. Commissioner,* 71 T.C. 340, 344 (1978). It is quite true that petitioner's activities had considerably more educational aspects than those of the Callaway Family Association. But *Callaway* is nevertheless squarely in point as to the nonexempt family purposes, which are comparable to those present here, and which are just as "substantial in nature" here as they were in *Callaway.* Accordingly, in terms of *Better Business Bureau,* the exemption is unavailable to petitioner "regardless of the number or importance of truly [exempt educational] * * * purposes," which may not have been present in *Callaway.*

4. *The collection and preservation of relics.* The association has collected thousands of relics. We have already noted the family's response to Warren Manning's request for furniture, pictures, tools, and other objects of interest and antiquity, all relating to the family in general. Although many of the items contributed have since been stolen or sold for various purposes, see note 2, *supra,* the remaining pieces are on display at the homestead, which is open to the public as a restaurant, or are stored for display in the special collection of the University of Lowell Library in Lowell, Massachusetts, with the exception of five valuable paintings which are stored in the homes of Manning family members.

The collection at the Lowell Library contains, in addition to various relics or artifacts, a number of personal materials

relating to Warren Manning, who sparked the creation of petitioner and who had a distinguished career as an architect. Those materials include some of Warren Manning's photos, his client lists, and letters written to his wife while on numerous trips. They were examined by a researcher at the University in the course of writing a thesis on Warren Manning. Clearly, the items stored at the Lowell Library serve an educational purpose. We are not told what items are on display at the manse. However, we do know that the restaurant, obviously for commercial purposes, uses the relics to create a "rustic" atmosphere, and exploits the historic aspects of the homestead to attract patrons from the history-conscious Boston area. Thus, we can and do find that although the relics on display at the homestead and used as decoration by the restaurant serve an educational purpose to some extent, they are also taken advantage of to a very substantial extent to promote nonexempt objectives.

The restaurant relies heavily upon the history of the "manse" to draw customers. The story of the "Manning Manse" is printed on the menus. The restaurant claims to be "keeping alive a tradition." One advertisement for the restaurant gives a brief account of the history of the "manse" and states that "Today the manse is owned by the Manning Association, Inc., made up of direct descendants of the Manning family. It has been renovated and houses a restaurant, serving meals to the public in a setting that is laden with history." Another advertisement claims that "This venerable homestead brings back nostalgic memories of days in the country." A restaurant guide from "Boston Magazine," submitted by the parties, states that "this tavern, complete with antiques and a rustic atmosphere, keeps alive the historic tradition."

5. *The Manning Manse.* Obviously, the Manning homestead is a historic structure and its preservation and the display of colonial artifacts therein certainly serve an educational purpose. Thus, such activities as foundation work, reclapboarding, painting, chimney pointing, and the like, are plainly classifiable as exempt efforts involved in preserving a historic building for educational purposes. But what is involved here in respect of that building is much

more—indeed much more that bears no relationship whatever, and in fact is antithetical, to the historic aspects of the manse. What we have here are extensive improvements and additions to the building that are of benefit to a privately operated restaurant that seeks to take commercial advantage of the historic background of the related premises.

The new main dining room added to the manse is described as a "large square addition seating about 150" and containing "recessed ceiling lights and rows of red plastic upholstered booths [which] stand out in modern contrast to the adjoining rough-hewn structure." That addition did not enhance the historic character of the manse; it in fact detracted therefrom for the sole benefit of a commercially operated restaurant. Indeed, the addition, according to Richard Manning, resulted in "some resistance to getting the building approved by the National Register [of Historic Places]." And even petitioner's stationery features a picture of the homestead on its letterhead *without* the restaurant addition.

Similarly, enlargements and modernization of kitchen facilities as well as providing office space for the restaurant were associated exclusively with the conduct of a restaurant business. Also, related primarily, if not exclusively, to the restaurant were other activities and "improvements" on the part of petitioner or required of the lessee. These involved such items as driveway work, expansion and paving of parking lots, installation of handicap ramps, addition of or improvements to ladies' and men's rooms, installation of exhaust fans, landscaping, fencing, placing of exit signs to comply with fire chief's requirements, and the placing or erection of a Manning Manse tavern sign. The June 27, 1981, Annual Meeting Report contains pictures and descriptions of the extensive landscaping work and states that "The landscaping makes the grounds attractive and spacious. It tremendously enhances the overall beauty of the property, while advertising to all the old-fashioned hospitality and dining found within." We also note that petitioner has considered the possibility that it may sell the homestead at some point and has given the lessee the right of

first refusal to purchase the property subject only to the prior right of purchase by any member of the association.

In the light of all of the foregoing, we find that petitioner's activities in relation to the manse were predominantly associated with a nonexempt purpose that was, according to the test in *Better Business Bureau v. United States,* "substantial in nature." Moreover, even considering the manse in isolation from the restaurant, it also served a nonexempt family purpose to the extent that it provided the setting for the Manning family annual meeting, and thus functioned, as originally envisaged by Warren Manning, as "a place of pilgrimage for Mannings." Although not of pivotal significance, we also find that personal, nonexempt considerations, such as family "honor" and "family pride," played a part in petitioner's efforts to register the Manning manse in the National Register of Historic Places.

---

Petitioner calls attention to *World Family Corp. v. Commissioner,* 81 T.C. 958 (1983), as suggesting, in petitioner's words, that "where a nonexempt function represents less than ten percent of total efforts, the doctrine of 'exclusively' will not be contravened." It then treats that suggestion as a "rule of law" establishing a "10-percent safe harbor" limitation, and undertakes to show that only about 10 percent of the time was expended by its officers and others on its behalf on matters relating to genealogy while some 90 percent of efforts were devoted to other matters such as negotiating the lease, etc. However, even though some portion of that 90 percent undoubtedly relates to exempt educational purposes, much, if not most, of it relates to nonexempt purposes. Certainly, the nonexempt purposes, including private family interests and the leasing and improvement of the premises for the conduct of a commercial restaurant business, represent a very substantial aspect of petitioner's operations. Moreover, contrary to petitioner's position, *World Family Corp. v. Commissioner* establishes no such 10-percent safe harbor rule. The Court there stated (81 T.C. at 967 n. 10):

We establish no general rule for future cases in finding 10 percent to be insubstantial. We noted a similar caveat in *Church in Boston* in which we found approximately 20 percent of expenditures to constitute more than an insubstantial activity: "We hasten to point out that while the facts in the instant case merit a denial of exempt status to petitioner, we do not set forth a percentage test which can be relied upon for future reference with respect to nonexempt activities of an organization. Each case must be decided upon its own unique facts and circumstances." *Church in Boston v. Commissioner,* 71 T.C. 102, 108 (1978).

This case must also be decided upon its own unique facts and circumstances. It is unnecessary for us to "make a determination based upon some economical and moral calculus * * * . It is sufficient only to find, as we do, that 'more than an insubstantial part of its activities is not in furtherance of an exempt purpose'." *Christian Stewardship Assistance, Inc. v. Commissioner,* 70 T.C. 1037, 1042 (1978). Petitioner's activities, whether viewed separately or in the aggregate, demonstrate that substantial private and noneducational interests are being served.

We reemphasize that the test for determining exempt status was expounded by the Supreme Court in *Better Business Bureau v. United States,* 326 U.S. at 283. The Court stated that "the presence of a single noneducational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes." As was observed in *Callaway Family Association v. Commissioner,* 71 T.C. at 344, "petitioner was not denied exemption because it has *no* exempt purposes, but rather because its activities, taken as a whole, are not 'exclusively' dedicated to exempt purposes." (Emphasis in original.) Similarly, although petitioner is engaged in some activities which are motivated by exempt purposes, its activities are also motivated by substantial nonexempt purposes. Thus, even in the presence of some activities that were truly motivated by exempt purposes, the concomitant presence of substantial nonexempt purposes destroys the exemption. *Better Business Bureau v. United States,* 326 U.S. at 283. After review of the entire record, we find that petitioner has not carried its burden to show that it is operated "exclusively" for exempt purposes as required by section 501(c)(3).

*Decision will be entered for the respondent.*