COPPERWELD STEEL COMPANY'S WARREN EMPLOYEE'S TRUST, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Copperweld Steel Co's Warren Employee's Trust v. Commissioner
Docket No. 41061-86X
United States Tax Court
T.C. Memo 1991-7; 1991 Tax Ct. Memo LEXIS 7; 61 T.C.M. (CCH) 1642; T.C.M. (RIA) 91007; 13 Employee Benefits Cas. (BNA) 1369; January 14, 1991, Filed *7 Decision will be entered for the respondent. Thomas C. B. Letson, for the petitioner. Carol A. Szczepanik, for the respondent. RAUM, Judge. RAUM
MEMORANDUM OPINION The Commissioner determined that petitioner does not qualify for exemption from income taxation as an organization described in section 501(c)(3). [1] Petitioner has invoked the jurisdiction of this Court to obtain a declaratory judgment as to its exempt status. [2] The case was submitted on the basis of the stipulated administrative record. Petitioner has its principal office at Warren, Ohio. *8 On December 30, 1941, petitioner came into existence as the result of an agreement between the Copperweld Steel Company (the Steel Company or the company) and five individual trustees. On January 2, 1947, the Commissioner sent petitioner a letter stating that it was entitled to exemption from tax under section 101(6) of the Internal Revenue Code of 1939, which was the predecessor of section 501(c)(3). The letter stated that petitioner was organized and operated entirely for charitable purposes. The original trustees or their successors modified their agreement with the Steel Company from time to time, and it was subsequently decided to restate the entire agreement in the form of a single document for convenience. This document (the 1967 trust restatement) was executed on April 28, 1967. Under the 1967 trust restatement, petitioner has five trustees, two of whom are trustees ex officio. The latter include the President of Local Union No. 2243 Affiliate of the United Steelworkers of America (Local No. 2243) and the President of Aristoloy 4590 Federal Credit Union (Credit Union). The three remaining trustees are employees of the Steel Company (the Steel Company trustees). If *9 either Local No. 2243 or the Credit Union should cease to exist, a replacement trustee is to be named by the remaining trustees, subject to the approval of the President of the Steel Company. If any of the Steel Company trustees should leave the company's employ or become unable or unwilling to serve, his successor is likewise to be named by the remaining trustees, subject to the approval of the president of the company. The 1967 trust restatement provides that the purpose of the trust is to assist employees in special cases regarding hospital bills and similar expenses, and to make loans for "constructive purposes," which include but are not limited to higher and vocational education. However, since July 1, 1977, the sole activity of the trust has been to "award scholarships" to deserving company employees and their families. [3] The record does not indicate why the activities of the trust were thus restricted after July 1, 1977. It is undisputed, however, that the trust's scholarship program had assumed its final form no later than November 2, 1977, which is the date of the document that governs petitioner's current program. This document is entitled "Copperweld Steel Company's *10 Warren Employees' Trust Scholarship Plan" (the Plan). [4]
The Plan states that the purpose of the scholarships is to "aid deserving and able employees of Copperweld Steel Company, *11 or their dependents, to secure an education at an accredited institution of higher learning." In order to participate in the program, "[t]he student shall be a Copperweld Steel Company employee or a dependent of an employee, retiree, or a former employee who became deceased while still associated with the firm." Although the Plan does not define the terms "employee" or "retiree," the 1967 trust restatement provides that an "employee" includes an individual who has been separated from the company's service for "operating reasons," but only if that employee might be re-employed if production volume increases, and only if the employee has not been separated for more than two years. Under no circumstances does the term "employee" include an individual who is separated for other than "operating reasons." Candidates for the scholarships make application therefore on forms kept in the company's personnel office. After completing the form, the applicant continues the process by delivering it to the college or university he or she wishes to attend. As used hereinafter the term "applicant" refers to a person who has the requisite employment-related connection with the company, and who has *12 filled out the application form required by petitioner and submitted it to the school of his or her choice. The only requirement petitioner imposes by way of limiting a recipient's choice of an institution is that it be accredited and that it be located within 50 miles of the company's plant. Petitioner does not require any showing of an applicant's academic qualifications, nor does the record indicate that it imposes any means test. Instead, it leaves such matters entirely to the scholarship committees of the participating schools, each of which is apparently free to set its own standards. After petitioner has decided upon the amount to be given to all the educational institutions in the aggregate, it divides this amount by the total number of applicants to determine an amount per applicant. It then donates to each school the per applicant amount multiplied by the number of applicants attending that school. According to the Plan, the schools may disburse the funds received from petitioner only to students having the requisite employment-related connection with the company, except in two situations. First, if a student is disenrolled from a given school for any reason during *13 a given year, any remaining funds awarded to that student for that year can "be used at the discretion of the school." Second, if no applicant qualifies to receive a scholarship under a particular school's requirements in a given year, all funds given to that school for that academic year are "released to be used at the discretion of the President of the school." In the letter accompanying its contribution to a particular institution, petitioner has expressed its views as to how the amount should be allocated among the applicants that the institution has determined are qualified. The letter first suggests that the "amount be divided equally among the students providing, however, they are eligible according to the University's requirements." The letter then goes on to state that "should disbursement to these individuals in different amounts be more appropriate, we would be supportive of such." In short, although the distribution to a college is in direct proportion to the number of applicants selecting that college, the college itself is free to determine under its own standards not only which of those applicants qualify for a scholarship but also the amount of the grant to any particular *14 applicant, notwithstanding petitioner's recommendation that the grants be made pro rata. And an examination of the administrative record discloses that while some of the schools have made pro rata distributions, that practice has not been uniform. For example, at the Trumbull Campus of Kent State University, there have been substantial differences in the amounts of the grants made to specifically identified students, ranging for one academic year from a total of $ 800 to each of two students to $ 260.50 to each of four students. During each of at least two of the following years the grants at that institution continued to vary in amount from one another. On the other hand, Hiram College reported equal grants of $ 470 to each of the scholarship winners for a specified academic year. Also, as between different schools, the standards of academic achievement required for a scholarship grant appear to have been far from uniform. Thus, based on the limited materials before us in the administrative record, we note that at the Trumbull Campus of Kent State University and Hiram College (with one exception), the scholarship recipients had grades higher than 3.0 on a 4.0 grading system, *15 whereas at Youngstown State University a number of the students had grades below 3.0 and some five of them below 2.0, with one of them even on "probation." We are thoroughly satisfied that petitioner's program does in fact operate for "educational" purposes within the meaning of section 501(c)(3), and does so in a bona fide nondiscriminatory manner. But this is not end of the matter. Section 501(c)(3) requires further that petitioner be operated "exclusively" for such purposes. However, although it has been held that the word "exclusively" is not to be construed as meaning "solely" or "absolutely without exception," Manning Association v. Commissioner, 93 T.C. 596, 603 (1989), there nevertheless remains the question whether there is also a sufficiently significant nonqualifying purpose such that the "exclusively" requirement of section 501(c)(3) is not satisfied. And a sufficiently significant nonqualifying purpose is one that is "substantial in nature." See Better Business Bureau v. United States, 326 U.S. 279, 283, 90 L. Ed. 67, 66 S. Ct. 112 (1945) ("the presence of a single [nonexempt] * * * purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of *16 truly [exempt] * * * purposes"). We followed Better Business Bureau in Copyright Clearance Center v. Commissioner, 79 T.C. 793, 804-805 (1982). In essence, it is the Government's position in this case that there is such a nonqualifying purpose, namely, to provide compensatory fringe benefits for the Steel Company's employees. It relies upon our opinion in Ohio Teamsters Trust Fund v. Commissioner, 77 T.C. 189 (1981), affd. 692 F.2d 432 (6th Cir. 1982). [5] In Ohio Teamsters, although we used such terms as "primary purpose" and "principal purpose" (77 T.C. at 197), that case should be read as resting upon the result of applying the "substantial in nature" test enunciated by the Supreme Court in Better Business Bureau and followed by us in Copyright Clearance Center. *17 Was there a "substantial" purpose to provide compensational fringe benefits here? As recognized by the Court of Appeals in Ohio Teamsters, 692 F.2d at 435, the inquiry is primarily a factual one, to which we now turn our attention. We conclude that although this is a weaker case for the Government than Ohio Teamsters, the scales tip in its favor, and we find that a substantial nonexempt purpose of petitioner's operations is to provide additional compensation for the Steel Company's employees in the form of fringe benefits. It is quite true, as we have found above and not disputed by the Government, that the educational objective served by the scholarship program is an exempt one. But, except in the two unusual situations referred to supra at 5-6, the educational opportunities provided by the Plan are strictly limited to the Steel Company's employees, their spouses, and children. (We use the term "employee" here and in the remainder of this opinion as a shorthand expression to refer to employees, retired employees, deceased employees, and temporarily laid-off employees.) The very process of getting a scholarship is initiated by the completion of an application obtained *18 at the personnel office of the Steel Company. The board which controls petitioner and makes the grants to the educational institutions is composed of three employees, the president of a labor union, and the president of a Federal credit union. And the approval of the President of the Steel Company itself is required in selection of any successor trustee at least in the case of any of the three employee trustees. Moreover, the schools that receive the grants are required to submit periodic reports to the Steel Company, suggesting at least some form of potential supervision by the company. Although petitioner leaves it to the respective schools to require the students to meet the standards of the schools for scholarship eligibility, the fact remains that the benefits conferred by the program are such that the employees or members of their family are enabled at least in part to pursue educational goals that they would otherwise have to pay for entirely on their own. Here indeed is a fringe benefit based on employment. We recognize that this may be a borderline case, but the burden of proof is upon petitioner. And we think it has not produced sufficiently satisfying evidence *19 in the record to establish that the "exclusive" purpose of its operations is educational in character rather than compensatory, i.e., that the purpose of providing compensatory fringe benefits was not "substantial in nature." See Copyright Clearance Center v. Commissioner, supra;Better Business Bureau v. United States, supra.
We quite agree with petitioner that Ohio Teamsters presents a different factual situation. There the educational program was established pursuant to a collective bargaining agreement between an employer (or employers) and a labor union representing employees, and the conclusion that the educational program in the circumstances there involved represented additional compensation was virtually compelled. Cf. Local Union 712, I.B.E.W. Scholarship Trust Fund v. Commissioner, T.C. Memo 1983-76; Newspaper Guild of New York v. Commissioner, T.C. Memo 1989-314. As previously noted, the present case is weaker, but we think that on the whole it lies on the same side of the line as Ohio Teamsters. Petitioner likens the present case to Chase v. Commissioner, T.C. Memo 1960-49, T.C.M. (RIA) 60049, 19 T.C.M. (CCH) 234. In Chase, however, *20 the program in question provided for scholarships only to those students who "evidenced superiority in scholastic standing, manifested qualities of character, loyalty, citizenship, ambition, self-reliance, leadership, integrity, work-application, and the like." Chase v. Commissioner, T.C. Memo 1960-49, 19 T.C.M. (CCH) 234 at 239, T.C.M. (RIA) 60049 at 270. Furthermore, the foundation in Chase administered "intelligence, interest, and comprehension tests" to all applicants except those with previous college experience. Chase v. Commissioner, supra, T.C. Memo 1960-49, 19 T.C.M. (CCH) 234 at 242, T.C.M. (RIA) 60049 at 274. Unlike petitioner in this case, the foundation in Chase concerned itself far more significantly with personal and educational goals. In our judgment, the present case falls on the other side of the line. Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all section references herein are to the Internal Revenue Code as amended and in effect for the period under consideration.↩
2. The jurisdictional requirements specified in sec. 7428, I.R.C. 1986 have been satisfied: petitioner is the organization whose exempt status is at issue; it has exhausted its administrative remedies; and this action was timely filed. Sec. 7428(b), I.R.C. 1986; see Rule 210(c), Tax Court Rules of Practice and Procedure.↩
3. We use the word "scholarship" for convenience in connection with petitioner's program of granting money to colleges and universities for ultimate distribution to Copperweld employees and their dependents. We express no opinion as to whether the grants made by petitioner constitute scholarships for purposes of Section 117.↩
4. Actually, the administrative record contains two different versions of the Plan. One is dated November 2, 1977, and the other is undated. The undated version requires the schools to send the Steel Company an annual report listing the names of recipients of the scholarships. The dated version requires schools to make this report quarterly and requires them to include the accumulative grade point averages of the recipients. Other discrepancies between the two versions of the Plan appear to be relatively minor.↩
5. In his letter denying section 501(c)(3) exemption to petitioner, the Commissioner stated that petitioner's earnings inured to the benefit of private individuals. However, on brief the Commissioner supports his position on the ground that petitioner was not operated for an exempt purpose within the requirements of section 501(c)(3)↩.